In the Matter of Disciplinary Proceedings Against
Charles K. Krombach, Attorney at Law:

Office of Lawyer Regulation,
Complainant-Respondent,

v.

Charles K. Krombach, Respondent-Appellant.

Supreme Court

*No. 2004AP60–D. Submitted on briefs October 12, 2005.
—Decided December 22, 2005.*

2005 WI 170

(Also reported in 707 N.W.2d 146.)

For the respondent-appellant there was a brief by *Charles K. Krombach,* Brookfield.

For the complainant-respondent there was a brief by *Charles S. Blumenfield,* Milwaukee.

¶ 1. PER CURIAM. Attorney Charles K. Krombach appeals from the referee's recommendation that Attorney Krombach's license to practice law in Wisconsin be revoked and that he be required to pay restitution in the amount of $27,135.05. After our own independent review, we adopt the referee's findings of fact and conclusions of law. We also agree that Attorney Krombach's misconduct necessitates that his license be revoked, that he pay restitution, and that he pay the costs of this proceeding.

¶ 2. On January 8, 2004, the Office of Lawyer Regulation (OLR) filed a five-count complaint against Attorney Krombach. Count I alleged that Attorney

Krombach's disbursement of trust account funds to himself without prior consent of the client constituted conduct involving dishonesty, fraud, deceit or misrepresentation in violation of SCR 20:8.4(c).[1] Count II alleged a violation of former SCR 20:1.15(d)[2] by Attorney Krombach's withdrawal of trust account funds prior to an accounting and severance of the interests in the trust account funds. Count III alleged that Attorney Krombach had violated SCR 22.03(6)[3] by making misrepresentations to, and failing to cooperate with, the OLR. Count IV alleged that Attorney Krombach had failed to provide a full accounting of trust funds upon request of his client in violation of former SCR 20:1.15(b).[4] Finally, Count V alleged that Attorney

[1] SCR 20:8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[2] Former SCR 20:1.15 applies to misconduct committed prior to July 1, 2004. Former SCR 20:1.15(d) provided:

> When, in the representation, a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be treated by the lawyer as trust property until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall continue to be treated as trust property until the dispute is resolved.

[3] SCR 22.03(6) provides that "[i]n the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance."

[4] Former SCR 20:1.15(b) provided:

> Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person in writing. Except as stated in this rule or

Krombach had violated former SCR 20:1.15(e)(ii)[5] by making cash withdrawals from his client trust account instead of writing checks drawn on that account.

¶ 3. Attorney Krombach filed an answer that admitted the occurrence of many of the transactions alleged in the complaint, affirmatively claimed that many of the transactions were done with the knowledge and consent of one of the clients and denied that he had engaged in any professional misconduct.

¶ 4. Richard M. Esenberg was appointed referee on February 12, 2004. He scheduled a final hearing on the matter for June 28, 2004. Shortly before the hearing, Attorney Krombach's counsel withdrew from the case, with Attorney Krombach's consent, because Attorney Krombach was no longer able to pay the fees. Attorney Krombach and the OLR then entered into a stipulation in which Attorney Krombach admitted most of the factual allegations and the five allegations of misconduct set forth in the complaint. The stipulation reserved the issues of restitution and discipline for further development and argument.

¶ 5. The referee held a one-day hearing concerning certain factual issues and the question of discipline. Following the hearing, the referee allowed Attorney

otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render a full accounting regarding such property.

[5] Former SCR 20:1.5(e)(ii) stated that complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include "a disbursements journal, listing the date and payee of each disbursement, with all disbursements being paid by check."

Krombach's therapist to submit a letter concerning his treatment of Attorney Krombach and he allowed the parties to submit evidentiary materials and briefs on the issue of restitution.

¶ 6. The referee then issued his report and recommendation. The referee's report included detailed findings of fact and conclusions of law based on the parties' stipulation and the evidence submitted at and following the hearing. The voluminous findings of fact will be summarized below.

¶ 7. Charles K. Krombach was admitted to practice law in Wisconsin in 1977. His prior disciplinary record includes a private reprimand. Attorney Krombach's license was temporarily suspended on April 6, 2005, for failure to cooperate with two additional investigations. His license has remained suspended until the date of this opinion.

¶ 8. Attorney Krombach began representing John M. on a personal basis in 1994. John M. was apparently a man of fairly modest means, although at one point he did come to own a couple of houses in Milwaukee, a parcel of land in the Town of Cedarburg and another parcel out of state.

¶ 9. In 1997, John M. and his two sons, John P. and Michael, agreed to develop and subdivide the Cedarburg parcel. The three retained Attorney Krombach to form a limited liability company (LLC) for that purpose. The LLC borrowed funds from AVCO Financial Services to pay for development expenses. Attorney Krombach deposited $45,610.69 of the AVCO loan proceeds into his client trust account. On the same day, Attorney Krombach wrote a trust account check to himself in the amount of $7565.28, primarily for John M.'s outstanding personal attorney fees. The referee concluded that, although these were LLC funds that

were being used to pay John M.'s personal attorney fees on other matters, it appears that the members of the LLC approved of this payment to Attorney Krombach. At least, the referee could not affirmatively conclude that this payment was unauthorized or improper.

¶ 10. Beginning shortly thereafter, Attorney Krombach made a number of disbursements from the LLC's funds in his trust account. For example, on August 27, 1997, he wrote a $500 check payable to "Cash," which he endorsed and cashed the same day. Attorney Krombach claims that he delivered this cash along with another $1000 check to John M. on the same day. He claims that the cash and the check represented loans from the LLC to John M. Although the referee could not conclude that John M. did not receive the money, there is no doubt that these disbursements were unauthorized at the time because the agreement among the members of the LLC was that any disbursement of $1000 or more required the approval of two members. Attorney Krombach has produced no evidence that anyone other than John M. approved of these "loans" at the time they were made.

¶ 11. During the following months, Attorney Krombach made a substantial number of payments to himself out of the LLC trust funds. The referee found that Attorney Krombach repeatedly paid himself from LLC funds on non-LLC matters involving only John M. personally. Attorney Krombach has produced no written authorization for these payments and has not alleged that anyone other than John M. gave him verbal authorizations, although John M. did not have such authority by himself. Indeed, when Attorney Krombach requested permission from John P. to pay his father's personal legal fees out of the LLC's funds, John P. expressly denied that permission.

¶ 12. Although these payments to Attorney Krombach from the trust funds were not authorized at the time they were made, there was some evidence that John P. and Michael, the other LLC members, ratified these payments after the fact. John P. acknowledged that he received statements regarding the use of the trust funds that would have indicated the amount of these payments. Although these trust statements may not have explicitly communicated the fact that these monies were being used to pay his father's personal legal fees, John P. did admit that he knew that his father's personal legal bills had been paid up to date as of July 1999, presumably from LLC trust funds.

¶ 13. Because Attorney Krombach was unsuccessful in obtaining governmental approval to subdivide the Cedarburg parcel, the LLC members decided to suspend payments on the AVCO loan, causing the property to go into foreclosure. By September 1998 the AVCO loan proceeds had been almost depleted, with nearly $26,000 of the original $45,610.69 having been paid to Attorney Krombach. Ultimately, the LLC was able to sell the parcel at what Attorney Krombach described as a "fire sale" price.

¶ 14. Attorney Krombach produced two invoices dated July 1, 1999, the date of the closing for the sale of the Cedarburg property. The first invoice was in the amount of $7752.62 and the second was in the amount of $4082.18. These invoices were apparently paid out of the proceeds of the closing.

¶ 15. After payment of the AVCO loan and other outstanding expenses, the LLC received $83,879.48 in proceeds from the sale, all of which was initially deposited into Attorney Krombach's trust account. Attorney Krombach then disbursed $31,915.81 to John P. as guardian for his father. In addition to the payment of

the two invoices identified above dated July 1, 1999, Attorney Krombach also wrote himself a check in the amount of $1963.67 on the date of closing, although he has never presented any invoice to justify this payment. The remaining $50,000 was retained in Attorney Krombach's general trust account until August 13, 1999, when the funds were transferred to a separate money market trust account controlled by Attorney Krombach.

¶ 16. Following the establishment of the money market account, Attorney Krombach engaged in a series of improper transactions. On August 13, 1999, he wrote a $1000 check to himself out of the money market account. Although this payment was allegedly for legal fees, Attorney Krombach could produce no documentation to show that he was owed outstanding fees anywhere near this amount. On August 20, 1999, Attorney Krombach wrote another check to himself in the amount of $2000. Although the $1000 and $2000 amounts were later credited toward fees for services provided to the LLC, Attorney Krombach's invoices show that those services were provided almost entirely after the date of the checks.

¶ 17. On September 14, 1999, Attorney Krombach wrote another check drawn on the money market account for $2000. Although Attorney Krombach's subsequent accounting claimed that this was for "JMR cash," the referee found that no cash was ever given to John M. at this time. Attorney Krombach's time entries on his invoice indicate that John M. requested a personal loan from the remaining LLC funds at this time, but that Attorney Krombach *denied* his request. Attorney Krombach's invoice of October 6, 1999, shows that Attorney Krombach applied this payment toward fees allegedly relating to the sale of the Cedarburg property,

although the sale had been completed more than two months earlier and the invoice showed a balance due of only $212.80. The resulting credit balance of $1787.20 was never repaid or applied to the LLC's account.

¶ 18. On October 8, 1999, Attorney Krombach transferred $5000 from the LLC's money market account to his trust account and wrote a check to himself in the amount of $2000. Attorney Krombach's check stub falsely shows that this check was voided. There is no invoice that supports the fees and it never did appear on any subsequent billing statement. Attorney Krombach claimed that the $2000 payment related to a personal legal matter for John M. regarding the potential creation of a charter school (the "school matter"). Attorney Krombach, however, produced no invoice concerning the school matter that showed that he was justified in taking this payment. Moreover, by this time it was crystal clear to Attorney Krombach that he was not authorized to use the LLC funds to pay John M.'s personal legal fees. Finally, the documentation provided by Attorney Krombach shows that he collected nearly $9000 in legal fees for the school matter, although he submitted invoices that totaled less than $2500.

¶ 19. On October 18, 1999, Attorney Krombach wrote a check to John M. for $9500 out of the LLC account. Although it appears that John M. endorsed the check and retained the money, Attorney Krombach again misappropriated the LLC funds because he admittedly had no authority to disburse LLC funds to John M.

¶ 20. On November 18, 1999, Attorney Krombach wrote a $1500 check to himself out of the LLC funds, which he then converted to cash. Attorney Krombach asserted to the OLR that he retained $300 for legal fees and gave the rest to John M. Attorney Krombach has no

receipt to prove that he gave the cash to John M. Moreover, distribution of LLC funds to John M. was not authorized and distributing trust funds in the form of cash is improper. Just as important is the fact that Attorney Krombach has produced no invoice that supported the $300 payment to himself.

¶ 21.   On December 15 and 30, 1999, Attorney Krombach wrote himself checks for $2500 and $1500, respectively. Again, he claims to have given $2000 in cash to John M., but has no receipts to prove that this occurred on either occasion. Attorney Krombach also has no invoices showing that either John M. or the LLC owed him $2000 in fees at this time. He has no documentation showing that these amounts were credited against any subsequent fees.

¶ 22.   The check dated December 30, 1999, raises another issue. The copy of the check received from the bank contains the notation "fees" on the memo line. On the copy that Attorney Krombach produced to the OLR during its investigation, Attorney Krombach added the words "& cash for JMR."

¶ 23.   With respect to the time period described above, Attorney Krombach repeatedly asserted that he was acting with the consent of John M., who Attorney Krombach believed was the person that should have been in charge. For instance, when asked at one point why he gave LLC funds to John M., Attorney Krombach responded that he had done so "[b]ecause it was his money, it was his land, and because he asked me to." As the referee notes, Attorney Krombach, as an experienced attorney, knew that John M. had transferred the land to the LLC, which meant that the loan and sale proceeds were the LLC's property. Attorney Krombach knew that the required number of LLC members did not authorize such payments to John M. Moreover,

599

there is testimony that John M. was an active alcoholic for much of this time period. Thus, Attorney Krombach's reliance on his lone consent is certainly misplaced. In addition, giving large amounts of cash to an active alcoholic without disclosing that fact to his sons and fellow LLC members is certainly not a wise course of action. In response, Attorney Krombach claimed that he was unaware of John M.'s alcoholism, which the referee found to be simply unbelievable.

¶ 24. John M. died on January 11, 2000. John P. informed Attorney Krombach of that fact on the same day. At that point, just six months after the sale of the Cedarburg property, the $50,000 in sales proceeds under Attorney Krombach's control had dwindled to $12,700.

¶ 25. On January 14, 2000, Attorney Krombach wrote himself a check out of the LLC funds in the amount of $5000. He claimed to the OLR that he retained $1500 for legal fees and gave $3500 in cash to John M. To support this assertion, Attorney Krombach backdated both his accounting to the OLR and his check stubs to show that the payment had been made on January 3, 2000, rather than on January 14, 2000. The bank records demonstrate that this was false. Moreover, at the time the check was negotiated, the memo line was blank. On the copy that Attorney Krombach gave to the OLR, he had added the words "fees & cash."

¶ 26. The referee found that Attorney Krombach fraudulently altered the check and his records in an attempt to hide the fact that he could not have given cash to John M. three days after his death. As the referee notes, Attorney Krombach's post-hoc alteration of these documents casts doubt on all of the other instances in which Attorney Krombach claims that he

gave cash to John M. Moreover, even if Attorney Krombach's story had been true, giving cash to John M. out of the LLC funds was contrary to the explicit directions of the LLC.

¶ 27. On February 15, 2000, Attorney Krombach wrote another check to himself, this time in the amount of $2000. While the accounting that Attorney Krombach gave to the OLR said that this was payment for legal fees, the bank's copy of the check indicated that it was for a "loan" to Attorney Krombach. Attorney Krombach altered the copy of the check he gave to the OLR by putting a question mark after "loan," apparently in an attempt to make it seem that the payment could have been for fees. Attorney Krombach produced no invoice or billing statement showing either (1) that this amount was owed by John M. or the LLC at the time or (2) that this amount was credited against subsequent fees.

¶ 28. On March 4, 2000, Attorney Krombach wrote himself yet another check in the amount of $3000. Attorney Krombach again altered the copy of the check that he produced to the OLR to indicate that this payment related to the school matter. There is no invoice, however, that shows any fees due on that matter or any subsequent billing statement showing that it was ever credited against any account. Moreover, Attorney Krombach's own computer account history shows that he received no fees on the school matter after December 30, 1999.

¶ 29. On March 27, 2000, Attorney Krombach wrote a check for $1000 to himself. The copy of the check provided to the OLR was again altered to reflect that the money related to fees on the school matter. The check stub contained notations that the payment could have been either for a loan to Attorney Krombach or for

fees on the school matter. No loan to Attorney Krombach was ever authorized and it could not have related to fees earned on the school matter.

¶ 30. On April 15, 2000, Attorney Krombach wrote yet one more check from the LLC funds in the amount of $1700, leaving only $2.91 in the LLC's money market account. Attorney Krombach asserted that this amount was in payment of several charges on an invoice of April 14, 2000. One charged $625 to John M.'s estate, although it was never sent to John M.'s personal representative and Attorney Krombach was never authorized to provide legal services to the estate. The invoice also included charges for Attorney Krombach's attendance at John M.'s funeral and for sending flowers. Another shows a fee of $470.54 for a real estate matter that had occurred many years before. The invoice also included an unspecified charge of $846.47 to the LLC, but did not identify the nature of the work performed. The referee noted that the LLC was not engaged in any activity at this time that would have required legal services.

¶ 31. Finally, Attorney Krombach included a charge of $6126 on the invoice of April 14, 2000, which represented a retroactive increase in Attorney Krombach's hourly rate from $125 to $150 per hour. Although Attorney Krombach claims that John M. had previously authorized this retroactive rate change, the referee found this assertion to be incredible. Moreover, even if John M. had in fact made such a statement, John M. had no authority, by himself, to agree to a retroactive rate change on behalf of the LLC.

¶ 32. As noted above, Attorney Krombach was never retained by John M.'s estate to perform any legal services. Instead, John P. hired Attorney Judith Bostetter to handle his father's estate. When Attorney Bostet-

602

ter on two occasions wrote to Attorney Krombach inquiring about estate assets in his possession, he did not reply. Finally, several months later, Attorney Krombach telephoned Attorney Bostetter and told her that there was "no money left." Indeed, he claimed that the estate owed him money, but that he was willing to forgive that debt. Although John P. and Attorney Bostetter asked for an accounting, Attorney Krombach never provided one, causing John M.'s estate to remain open.

¶ 33.  Based upon Attorney Krombach's stipulation and the factual findings detailed above, the referee concluded that Attorney Krombach had engaged in professional misconduct as alleged in each of the five counts contained in the OLR's complaint.

¶ 34.  The referee concluded that Attorney Krombach's multiple disbursements to himself of trust account funds, without the prior knowledge or consent of the respective clients, constituted conversion of client funds to Attorney Krombach's own personal use. Moreover, Attorney Krombach failed to disclose and pay to John M.'s estate the trust account funds that Attorney Krombach held at the time of John M.'s death, but instead took them for his personal use. As alleged in Count I, these actions by Attorney Krombach constituted conduct involving dishonesty, fraud, deceit or misrepresentation in violation of SCR 20:8.4(c).

¶ 35.  The referee concluded that Attorney Krombach had violated former SCR 20:1.15(d) by withdrawing funds from his client trust account for alleged legal fees without the clients' prior knowledge or consent.

603

¶ 36. The referee further found that Attorney Krombach had made false and misleading representations to the OLR, had provided inaccurate accountings, and had altered copies of canceled checks that he produced to the OLR. The referee concluded that Attorney Krombach's willful conduct of failing to provide relevant and full information to the OLR and his intentional misrepresentations to the OLR violated SCR 22.03(6).

¶ 37. As alleged in Count IV, the referee determined that by failing to provide accountings as requested by John P. and by the attorney for John M.'s estate, Attorney Krombach had failed to render a full accounting of trust funds upon request of the client or third person in violation of former SCR 20:1.15(b).

¶ 38. Finally, the referee concluded that Attorney Krombach's multiple disbursements of cash from trust account funds violated former SCR 20:1.15(e)(ii), which requires that all trust account disbursements be made by check.

■

¶ 39. The referee noted that, even in cases where an attorney has stolen funds from a client, the assessment of the level of discipline to be imposed requires an analysis of the particular facts of the case. In conducting this assessment, however, it is important to note that clients that are vulnerable especially require protection from those who abuse their professional position to enrich themselves. *See In re Disciplinary Proceedings Against Gilbert,* 227 Wis. 2d 444, 474, 595 N.W.2d 715 (1999).

¶ 40. One area of major concern for the referee was Attorney Krombach's intent. Although Attorney Krombach acted in violation of former SCR 20:1.15 in

disbursing LLC funds to himself prior to the property sale in July 1999, the referee concluded that Attorney Krombach was generally able to substantiate that the monies he paid to himself during that time period were for fees that Attorney Krombach actually earned for work on behalf of either the LLC or John M. personally. Moreover, although the referee concluded that neither John P. nor Michael had ever clearly "signed off" on an accounting for these funds, there was not clear and satisfactory evidence that would support a finding that a majority of the LLC members never acquiesced in these payments. Thus, while Attorney Krombach had failed to treat the funds as trust account funds until an agreed-upon severance of his clients' interests, in violation of former SCR 20:1.15(d), it does not appear that he stole these pre-sale funds without his clients' knowledge.

¶ 41. The referee reached an entirely different conclusion concerning Attorney Krombach's intent after the July 1999 sale of the Cedarburg property. From this point forward the referee concluded that Attorney Krombach in many instances was simply stealing the LLC's money. Attorney Krombach was unable to produce invoices or other documentation to justify his payments to himself or his purported disbursements to John M. Moreover, Attorney Krombach's alteration of documents and his "shifting explanations" for these payments indicate that Attorney Krombach was simply converting his clients' money for his own personal needs.

¶ 42. The referee concluded that Attorney Krombach's reliance on alleged oral authorizations by John M. was further evidence of Attorney Krombach's wrongful intent. By this time John M. was suffering from active alcoholism, such that his son was appointed

to act as his guardian. Thus, Attorney Krombach's own statements, even if true, would indicate that he was manipulating a vulnerable client to cover his taking of funds.

¶ 43. Furthermore, the referee notes that even Attorney Krombach's excuse of oral consent from John M. cannot cover the taking of nearly $12,700 that occurred after John M.'s death. Instead, Attorney Krombach attempted to hide what he had done by altering documents and making up the incredible story that John M. had agreed to a retroactive increase in Attorney Krombach's hourly rate. In sum, as the referee noted, "what may have begun as sloppiness and poor judgment eventually became outright theft."

¶ 44. In addition to the items described above (manipulation of a vulnerable client and alteration of documents to mislead the OLR), the referee found other aggravating factors that support a more serious level of discipline. The amount of money taken by Attorney Krombach was substantial, especially in light of the limited finances of his clients. Moreover, Attorney Krombach, despite expressing an intent to reimburse what he took, has not made any attempt to pay back anything. The referee found that, although Attorney Krombach has stipulated to wrongdoing and has admitted regret, he still has not demonstrated an understanding that what he did was steal from his clients. Although he has no documentation to support many of the payments to himself, he continued to express the idea that his mistakes were due to sloppy practices, including his practice to "round off" his legal fees. Moreover, his restitution brief to the referee seemed to indicate that, at the end of the day, he owed his clients nothing. This does not demonstrate an acceptance of responsibility.

¶ 45. On the mitigating side, the referee found that, as of the date of his report, Attorney Krombach had received only one private reprimand during a fairly lengthy career. Attorney Krombach's history with John M., the informal, family nature of the business venture and the apparent acquiescence of John P. and Michael in the manner of paying John M.'s personal legal fees out of LLC funds may mitigate to some degree Attorney Krombach's disbursements of trust account funds prior to the property sale in July 1999. Those factors cease to explain Attorney Krombach's conduct after the sale. Finally, the referee noted that Attorney Krombach had been receiving treatment for depression from 1997 through 1999 and from May 2003 through the present. Nonetheless, the referee refused to consider this as a mitigating factor because Attorney Krombach produced no evidence that the depression caused his misconduct.

¶ 46. After reviewing all of the relevant factors, the referee concluded that even a lengthy suspension would not do justice to the theft of client funds from a vulnerable man. In the opinion of the referee, revocation is required in light of Attorney Krombach's falsifying records produced to the OLR, his lying about his knowledge of John M.'s alcoholism, and his brazen theft of money from a vulnerable man of modest means.

¶ 47. As noted above, subsequent to the submission of the parties' stipulation and the evidentiary hearing, the referee invited the parties to submit memoranda concerning the proper amount of restitution to be paid. Attorney Krombach submitted a restitution memorandum that admitted restitution was proper only as to the $12,700 taken after John M.'s death. Even as to this amount, Attorney Krombach claimed that it was subject to an offset for his claims against John M.'s estate. Needless to say, the referee

607

found Attorney Krombach's restitution memorandum to be unhelpful. The memorandum failed to tie billings and receipts and to justify the fees that Attorney Krombach allegedly claims he was due. In the end, the referee simply found that he could draw no conclusions from Attorney Krombach's restitution memorandum.

¶ 48.  Based on his own analysis, the referee concluded, as the OLR had recommended, that Attorney Krombach should be required to pay restitution for amounts that he took that were not justified by an invoice for legal fees or a receipt from John M. This had the effect of eliminating from the restitution amount a large number of payments that Attorney Krombach had made to himself prior to the July 1999 sale even though those payments had been made from LLC funds without authorization by the LLC. To reach a restitution total, the referee analyzed the bills actually submitted by Attorney Krombach and compared them to the payments he received.

¶ 49.  The referee concluded that the OLR's schedule of improper payments closely followed his conclusions with a few modifications. The OLR's schedule called for restitution in the amount of $33,632.25. The referee's modifications eliminated three payments, although still violations of former SCR 20:1.15, because Attorney Krombach had ultimately produced invoices showing legal services against which the payments were credited. The three eliminated payments reduced the restitution amount by $7993.74. The referee, however, also added a restitution amount of $1496.54 not shown on the OLR's schedule because that amount was never supported by an invoice that showed what work had been done to earn it. These adjustments resulted in a recommended restitution amount of $27,135.05.

¶ 50. Attorney Krombach has appealed from the referee's recommendation that his license to practice law be revoked. Before we turn to his arguments on appeal, we note that Attorney Krombach has not appealed any of the referee's factual findings or conclusions of law. He also has not appealed from the referee's restitution recommendation. Consequently, after our review of the matter, we adopt the referee's findings of fact and conclusions of law as to Attorney Krombach's misconduct. *See In re Disciplinary Proceedings Against Sosnay,* 209 Wis. 2d 241, 243, 562 N.W.2d 137 (1997) (referee's findings of fact to be affirmed unless clearly erroneous); *In re Disciplinary Proceedings Against Carroll,* 2001 WI 130, ¶ 29, 248 Wis. 2d 662, 636 N.W.2d 718 (referee's conclusions of law subject to de novo review). We also agree that Attorney Krombach should pay restitution in the amount of $27,135.05.

¶ 51. Although Krombach does not argue on appeal that any of the referee's factual findings are clearly erroneous, he nonetheless sets forth from his point of view a factual recitation of the history of his representation of John M. and the LLC. His recitation continues to give the appearance that his conduct was due simply to relying on the informal manner in which he and John M. allegedly operated.

¶ 52. Many of the assertions in his factual statement, however, were expressly rejected by the referee. For example, Attorney Krombach claims that periodic accountings were provided to the LLC members, which were "satisfactory for their purposes at the time." Attorney Krombach also asserts that with respect to disbursements after the July 1999 property sale, "[v]erbal authorization was obtained comparable to written authorization applicable to the AVCO funds." This ignores the fact that Attorney Krombach did not have

609

written authorization on most occasions to disburse trust account funds from the AVCO loan to himself prior to the sale and that John M. had no authority, by himself, to allow disbursements after the sale. In addition, although the referee found his claim to be false, Attorney Krombach continues to assert that John M. authorized a retroactive change in Attorney Krombach's billing rates that he did not effectuate until months after John M.'s death.

¶ 53. Ordinarily, since Attorney Krombach is not challenging the referee's factual findings, we would ignore his factual recitation. We feel constrained to discuss it in this case, however, because it bears on the level of discipline to be imposed. Attorney Krombach's statements show that he still refuses to accept that what he did was wrong. Despite overwhelming evidence and his own stipulation to ethical violations, he continues to make excuses for his conduct.

¶ 54. The primary thrust of Attorney Krombach's argument is that the referee's recommendation of revocation is simply too severe. Although he provides no citations to the record, Attorney Krombach challenges a number of statements in the referee's report and claims that the referee incorrectly viewed certain aspects of his case in reaching his recommendation.

¶ 55. Attorney Krombach first alleges that the referee improperly ignored mitigating factors. Attorney Krombach asserts that he chose to terminate his legal counsel allegedly in order to conserve funds for payment of restitution. He claims that the referee, however, imputed a negative connotation to the termination of his attorney's services. Attorney Krombach also asserts that he "eventually" cooperated with the OLR and produced, allegedly at a significant expense, voluminous records extending all the way back to 1993. He

blames the OLR's staff for seeking such wide-ranging documents, viewing the allegations in the complaint as related only to the July 1999 property sale. Attorney Krombach further takes the referee to task for ignoring the contents of the report submitted by Attorney Krombach's therapist and instead focusing on the fact that the report showed that Attorney Krombach had not admitted wrongdoing even to his therapist. Finally, Attorney Krombach asserts that he has in fact personally expressed remorse and contrition.

¶ 56.  We have reviewed Attorney Krombach's arguments in this regard and find them to be without substantial merit. The referee's comments were reasonable in light of the facts of the case. Attorney Krombach has not challenged those factual findings. The referee properly considered many factors in his reaching his recommendation. We do not find fault with his analysis. Moreover, it is the responsibility of this court to impose whatever sanction it deems appropriate regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Ray,* 2004 WI 45, ¶ 5, 270 Wis. 2d 651, 678 N.W.2d 246.

¶ 57.  In addition to his criticism of the referee and the OLR, Attorney Krombach cites to several cases that he claims support his request for a lesser sanction. The cases he cites, however, are readily distinguishable from the misconduct at issue here.

¶ 58.  First, Attorney Krombach points to *In re Disciplinary Proceedings Against Marine,* 82 Wis. 2d 602, 611–12, 264 N.W.2d 285 (1978), in which the court imposed a six-month suspension. That case, however, involved a single instance where the attorney had transferred $2500 in trust funds to himself to pay for legal fees. Although the court found that the total fee

had been excessive, it was clear that the attorney had performed a substantial amount of work to earn the great majority of the total fee. This scenario has no relation to Attorney Krombach's longstanding pattern of theft from a vulnerable client.

¶ 59. Attorney Krombach's reliance on *In re Disciplinary Proceedings Against Theobald,* 2004 WI 59, 271 Wis. 2d 690, 679 N.W.2d 804, is equally misplaced. Attorney Theobald's misconduct was light years away from the referee's findings here. Attorney Theobald's misconduct consisted of a number of instances of failing to inform clients of the status of their matters, improperly delaying the return of a client's file, and failing to cooperate promptly with the OLR's investigation. In comparison, Attorney Krombach's misconduct includes theft of client funds for personal gain and altering documents produced to the OLR in order to hide his theft.

¶ 60. The ninety-day suspension of *In re Disciplinary Proceedings Against Schuster,* 2003 WI 135, 266 Wis. 2d 36, 670 N.W.2d 545, rested on misconduct significantly less egregious than Attorney Krombach's actions. In that case, Attorney Schuster stipulated that she commingled personal funds with client funds, wrote checks on her client trust account when she did not have sufficient funds on deposit to cover them, and wrote checks payable to herself or to "cash" without determining the clients to whom the funds were attributable. *Id.,* ¶ 5. She also failed to maintain proper trust account records, improperly withdrew from a representation in a manner that prejudiced the client's interests, and made misrepresentations to the OLR. *Id.,* ¶¶ 5, 17. Unlike Attorney Krombach's conduct, however, there is no indication that Attorney Schuster profited from her wrongdoing. She also rectified matters when the OLR

brought them to her attention (although in a belated fashion). Here, Attorney Krombach's conduct consisted of many instances of conversion of client funds over a long period of time, involved the taking of nearly $30,000 from an alcoholic client, and has not resulted in any attempt to repay the misappropriated funds.

¶ 61. The facts of *In re Disciplinary Proceedings Against Webster,* 217 Wis. 2d 371, 577 N.W.2d 21 (1998) (two-year suspension), are also different from the present case. In that case, Attorney Webster participated in concealing a debtor's property from a bankruptcy trustee and was found to have given false testimony during his criminal trial. *Id.* at 374–75. The OLR stipulated to a number of mitigating factors in Attorney Webster's favor: the client's creditors had not suffered due to the bankruptcy fraud, Webster did not gain any personal benefit, Webster had a history of helping civic and charitable groups, and he had fully cooperated with the investigation of the Board of Attorneys Professional Responsibility. *Id.* at 376. Again, the factual differences include Attorney Krombach's theft of funds for his personal use, the substantial harm to his clients, and his misrepresentations to the OLR.

¶ 62. Although each case turns on its specific facts, in many instances we have revoked the licenses of attorneys that have converted client funds to their own personal use. *See, e.g., In re Disciplinary Proceedings Against O'Byrne,* 2002 WI 123, 257 Wis. 2d 8, 653 N.W.2d 111 (revocation imposed where attorney converted nearly $34,000 of client funds and altered checks produced to the OLR); *In re Disciplinary Proceedings Against Hinnawi,* 202 Wis. 2d 113, 549 N.W.2d 245 (1996) (revocation imposed where attorney converted substantial client funds while serving as personal representative and attorney for estate); *In re Disciplinary*

*Proceedings Against Wright,* 180 Wis. 2d 492, 509 N.W.2d 290 (1994) (attorney's use of her professional position to take client money for herself warranted license revocation, even where attorney had no prior disciplinary history).

¶ 63.   Given Attorney Krombach's extended pattern of converting large sums of the LLC's money for his own personal use, his alteration of documents in an attempt to hide his theft, his taking advantage of a vulnerable client, and his continued failure to demonstrate acceptance of responsibility for his wrongful actions, we agree with the referee's recommendation that Attorney Krombach's license to practice law must be revoked. We further agree that Attorney Krombach should be ordered to pay restitution in the amount of $27,135.05 and that he should pay the costs of this proceeding, which were $10,193.18 as of October 12, 2005.

¶ 64.   IT IS ORDERED that the license of Charles K. Krombach to practice law in Wisconsin is revoked effective the date of this order.

¶ 65.   IT IS FURTHER ORDERED that Charles K. Krombach comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been revoked.

¶ 66.   IT IS FURTHER ORDERED that within 60 days of the date of this order, Charles K. Krombach make restitution to the LLC or its members in the amount of $27,135.05.

¶ 67.   IT IS FURTHER ORDERED that within 60 days of the date of this order Charles K. Krombach pay to the Office of Lawyer Regulation the costs of this proceeding.

¶ 68. IT IS FURTHER ORDERED that restitution to the LLC or its members is to be paid prior to paying costs to the Office of Lawyer Regulation.