# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-1908

PAULA BLISE,

Plaintiff-Appellant,

v.

JOHN M. ANTARAMIAN, STEVE
STANCZAK, NICK E. ARNOLD, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 900—**Charles N. Clevert, Jr.**, *Judge.*

_____

ARGUED JANUARY 6, 2005—DECIDED JUNE 1, 2005

_____

Before MANION, WOOD, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Paula Blise, a black woman, brought this suit in the Eastern District of Wisconsin against the City of Kenosha, Wisconsin ("Kenosha" or the "City"), John Antaramian, the City's Mayor, Nick Arnold, the City Administrator, and Steve Stanczak, the City's Director of Personnel. Blise alleges that the defendants violated her constitutional right to equal protection through an ongoing policy and practice of not promoting blacks to positions of

influence and authority. The district court granted summary judgment in favor of all of the defendants. We affirm.

## I.

Paula Blise has worked for Kenosha in various capacities since 1979. From 1979 to 1988 Blise worked as a secretary in the City's Public Works Department. In 1988, Blise was promoted to serve as an administrative secretary for the Kenosha Regional Airport. Six years later, Blise received a promotion to serve as an administrative coordinator for the airport. In 1995, Blise was again promoted to serve as Zoning Coordinator for Kenosha.[1] According to the district court, "[t]he Zoning Coordinator is a high profile administrative position and is responsible for management and enforcement of municipal zoning regulations, code compliance and enforcement-related activities." *Blise v. Antaramian*, No. 01-C-900, slip. op. at 2 (E.D. Wis. March 8, 2004). The following year, Blise was appointed to serve as a Community Specialist with the City. She continued, however, to serve as the Zoning Coordinator.

In March 2001, the City announced a job opportunity for the position of Operations Coordinator (the "OC") for the City's Public Service Department. Responsibilities of the OC include "perform[ing] and coordinat[ing] many functions affiliated with the Public Services Department such as [the] resolution of problems, expediting service request of citizens, [the] Common Council and [the] Administration[, as well as p]reparation and management of the Public Service budget."

---

[1] Blise was encouraged to apply for this position, in fact, by one of the defendants in this suit, Nick Arnold.

The City set certain requirements for a successful applicant for the OC position. Because these have some bearing on this case we repeat them here.

1.  Experience in public works administration and public relations techniques.

2.  Graduation from an accredited college or university, with course work in engineering, planning, public administration or a related field. A Master's degree in a related field was desirable.

3.  Five or more years of progressively responsible experience, which included field, office, supervisory and/or public relations responsibilities.

4.  Equivalent combinations of education and experience which provide the required knowledge, skills and abilities may also be considered at the discretion of the Director of Personnel.

5.  Possession of a valid driver's license and an above average driving record.

6.  Ability to provide a personal vehicle for use on the job.

7.  Ability to obtain and maintain a valid Commercial Driver's license prior to the expiration of the probationary period.

Thirty-two people applied for the OC position including Blise and a white woman named Jan Davis. Only twelve of the applicants, including Blise and Davis, were determined to have met the basic criteria for the position. These twelve were invited to participate in a volunteer panel interview.

The volunteer panel interview is an intermediate step in the appointment process for a position such as the OC and is intended to winnow down the number of candidates. The panel for the OC position, consistent with City policy,

consisted of three volunteers not employed by the City. Volunteers are members of the community with professional, technical, human resources, and education backgrounds.

Prior to conducting the interview, the panel members received a packet of information including a description of the OC position, a rating sheet, and guidelines on how to rate candidates. Each panelist also received a list of interview questions that had been reviewed by City's Director of Personnel, Steve Stanczak, and the City Administrator, Nick Arnold.

The volunteer interview panel for the OC position convened on May 16, 2001. Each of the twelve applicants met individually with the panel and was assigned a score by each panelist. The three scores for each applicant were then averaged and a final score was assigned. Blise received the highest score from the panel.

As we noted above, however, the volunteer interview panel was not the final step in the appointment process. Moreover, a high score, even the highest score, did not guarantee that an applicant would receive the position. In fact, receiving the highest score from the volunteer interview panel did nothing more than guarantee that Blise would continue on to the final step of the process. All of the candidates not eliminated after the volunteer panel interviews stood on equal footing in the final round—an interview with City officials. In this case (and we presume it was the general practice of the City), the City officials conducting this final interview, Arnold and Kenosha's Mayor, John Antaramian, did not even receive a copy of the applicants' scores in the volunteer interview panel.

After the volunteer interview panel, Stanczak directed Nina Millsaps, a personnel analyst for the City, to certify

five applicants as finalists for the position: Paula Blise, Randy Kerkman, Michael Hayek, Chuck Stachowski, and Todd Ingrouille. Other than Blise, all the finalists where white men.

Because of the racial and gender composition of the finalists, Stanczak determined that it was necessary to invoke the City's "Expanded Certification" policy. Under that policy, which dates back to 1983, the City is obligated, in certain circumstances, to include at least two minority and/or two female applicants in the certified list of final applicants for an employment position. These circumstances include particular job categories where women and/or minorities are underepresented. The certification list for such a position must include the two highest scoring women and/or minority candidates, and they must meet all the minimum qualifications for that position.

In this case, the percentage of minorities and women employed in a job similar to the OC position was, according to Kenosha, well below the City's goal. Other than Blise, however, there were no other qualified minority candidates. Thus, only a person meeting the gender quota could be added to meet the Expanded Certification policy. That person was Jan Davis, who, conveniently (as we shall see), received the sixth highest score from the volunteer interview panel.

Thus, six candidates were certified for the final stage of the hiring process: an interview with Arnold and Antaramian. These interviews took place on May 29 and June 4, 2001. Antaramian's participation in the interviews was unusual. He participated in the interviews only because the Public Service Department's interim director was unavailable.

Arnold asked each of the finalists questions about their background and experience as well as how that experience

and background would apply to the OC position. Arnold took notes on the finalists' answers and asked follow-up questions based on a finalist's response to a question. It appears that Antaramian was largely silent during the interviews.

Both men assigned a score to each finalist at the conclusion of their interview. As with the prior round of interviews, an average score for each finalist was compiled, and this score became the final ranking for the candidate. The scores were as follows:

Randy Kerkman 89

Todd Ingrouille 86

Jan Davis 82.5

Chuck Stachowski 81

Paula Blise 79

Michael Hayek 77.5

Before a hiring decision could be made, however, Ingrouille removed himself from consideration.[2] With him out, however, the list of finalists was still in keeping with Kenosha's civil service rules that require the hiring decisionmakers to consider at least five candidates (assuming, of course, there are five qualified applicants). Davis, who was originally added on as a sixth candidate under the expended certification policy, was now securely on the list as one of the remaining five with the highest scores given by the volunteer panel.

---

[2]  It appears, in fact, that Ingrouille told Antaramian and Arnold at the conclusion of his interview that he was not interested in the position anymore. He still received the second highest score.

With Ingrouille out, the final rankings were set. These rankings were identical to the scores set forth above (leaving out Ingrouille). The OC position was offered to Kerkman. who had the highest score. But when Kerkman also declined the offer, Jan Davis, who had the third highest score, was then offered the position, which she accepted on June 11, 2001.

Blise filed the present suit less than a month later. In her suit, Blise alleged that the City and the individual defendants, Antaramian, Arnold, and Stanczak, discriminated against her on the basis of her race. The defendants moved for summary judgment. The district court granted the motion on March 8, 2004. This appeal followed.

## II.

Blise challenges the district court's grant of summary judgment in favor of the defendants. Our review is de novo. *McPherson v. City of Waukegan*, 379 F.3d 430, 437 (7th Cir. 2004). A party is entitled to summary judgment in its favor when "there is no genuine issue of material fact and he or she is entitled to judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Blise claims that the City and the individual defendants discriminated against her because of her race in violation of 42 U.S.C. § 1981.[3] Section 1981 prohibits, among other

---

[3] Blise also argues that the expanded certification policy is unconstitutional. Blise did not, however, adequately develop this argument on appeal. The only authority that Blise cites are cases where this court has identified what a policy or custom is in the context of § 1983 litigation. There is no discussion of, or citation

(continued...)

things, an employer from discriminating against a job applicant on the basis of the applicant's race. As with other discrimination claims, a plaintiff can proceed by introducing direct or circumstantial evidence of discrimination, the so-called "direct method" of proving discrimination. *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004). Blise, as best we can tell, does not suggest such evidence exists here. *See id.* ("Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus. A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action.") (internal citations and quotation marks omitted).

---

[3] (...continued)
to, legal authorities that demonstrate that the expanded certification policy is unconstitutional. The failure to develop an argument constitutes a waiver. *See Kramer v. Banc of America Securities, LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) ("We have repeatedly made clear that perfunctory and undeveloped arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).

Even assuming Blise had properly developed her argument, it is unclear that she has even suffered the necessary cognizable injury attributable to the expanded certification policy. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Blise lost out on the OC position to Davis. At first Davis's presence as a finalist was due to expanded certification. When Ingrouille dropped out, Davis's presence was no longer due to the policy but due to the fact that she was the applicant next in rank at the end of the volunteer interview process. It appears, therefore, that the expanded certification policy did not injure Blise.

Instead, Blise seeks to make a prima facie case for discrimination using the familiar *McDonnell Douglas* test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In the failure to hire context, the *McDonnell Douglas* test requires Blise to show that: (1) she was a member of a protected class; (2) she was qualified for an open position for which she applied; (3) her application for employment was rejected; and (4) Kenosha filled the position with someone not of Blise's protected class, or left the position open. *Koszola*, 385 F.3d at 1110.[4]

Blise has made out a prima facie case: she is a member of a protected class, she was qualified for the position; she was not chosen for the position; and the position was filled by a person who was not a member of Blise's protected class.

Simply making out a prima facie case does not, however, entitle Blise to a judgment in her favor or even the chance to present her case to a jury. Kenosha has the opportunity to "articulate a legitimate, nondiscriminatory reason" for its decision not to hire Blise. *Id.* Only if Kenosha cannot articulate such a reason or Blise can show that this reason was pretextual is Blise entitled to judgment in her favor. *Id.* A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendants] or indirectly by showing that the [defendants'] proffered explanation is unworthy of credence." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). We have emphasized that an employer's decision to hire is pretextual when it is a lie—a phony

---

[4] Although *Koszola* is a Title VII case and not a § 1981 case, the same standards apply. *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002) (quoting *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d. 1025 , 1035 (7th Cir. 1998)).

reason meant to cover up a disallowed reason. Otherwise, an employer's decision to favor one candidate over another can be "mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

Kenosha states that the reason it did not hire Blise was because she was not the highest ranked applicant at the conclusion of the application process. She scored fifth out of the six applicants who were interviewed by Arnold and Antaramian (and fourth out of five if you exclude Ingrouille, whose score must have been *pro forma* given that he told the two at his interview he did not want the job). The job was offered to the highest-scoring finalist and then (after he declined) to the next highest-scoring applicant still interested in the job—Davis.

Blise attacks this reason on multiple fronts.[5] First, Blise argues that Davis was ineligible for the position of OC because she did not meet several of the qualifications set forth above. Specifically, Blise argues that Davis failed to meet qualifications One, Two, Three, and Seven. As can be expected, Kenosha vigorously argues that Blise is wrong and that she has distorted or misrepresented Davis's resume and deposition testimony.

---

[5] Blise also claims that the defendants varied their reasons for having the expanded certification process, and for determining why Davis was more qualified. Thus the reasons given were pretextual and summary judgment was inappropriate. We find no support in the record for Blise's claim. Blise was not offered the job because she was not the highest-scoring applicant. This is, and has been, Kenosha's reason throughout this case.

We need not decide who was or was not qualified. The two decisionmakers scored each applicant and ranked them in order of their averaged score. It is not for us to second-guess their formula. Moreover, even if Blise were to somehow disqualify Davis, Stachowski would be next in line for the offer because he was also ranked higher than Blise.

Relative qualifications notwithstanding, we have repeatedly stressed that "we do not sit as a superpersonnel department" where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices. *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)); *see also Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Blise may be right—she may be more qualified than Davis, and Davis may not be qualified at all—but so long as Kenosha genuinely believed differently (and Blise offers us no evidence that its agents did not), it is entitled to act on that belief.

Blise also challenges the interview process. Specifically, Blise argues that the scoring of the interviews was flawed because it was not based on any "objective criteria." Blise also argues that Arnold and Antaramian asked the applicants different questions and that there was no uniformity in the interview process.

We fail to see how any of this demonstrates that the reason Blise was not selected was illegitimate or a pretext. There is no legal requirement that an interviewer ask all job applicants the exact same questions. Applicants for a job typically come to the process with diverse professional backgrounds. Exploring these backgrounds may require an interviewer to ask different questions of different applicants. Job interviews are often a give-and-take process. An applicant's answer to one question may prompt the inter-

viewer to ask a follow-up question that the interviewer might not need to ask of another applicant.

This court has also never held that a job interview must be scored according to some sort of objective criteria. Quite the contrary. *See Millbrook*, 280 F.3d at 1176 (quoting *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998) ("[N]othing in Title VII bans outright the use of subjective evaluation criteria."));[6] *Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001), *quoted in Millbrook*, 280 F.3d at 1176 ("It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation."). A job interview will often involve "fleshing out" an applicant's resume (for instance, an interviewer may ask an applicant to explain the work a previous job involved). While this function, we suppose, *may* be reduced to objective criteria, there is no doubt that an interview also allows an interviewer to get a sense of the applicant's personality, poise, and manners. These are all traits that are in the eye of the beholder and all traits that any employer would surely like to have a sense of before making a hiring decision.[7] It is difficult to see how such traits could be measured by any objective criteria. *See id.* at 1185-86 (quoting *Chapman v. A.I. Transport*, 229 F.3d 1012, 1033-34) (11th Cir. 2000) (en banc)) ("[S]ubjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becom-

---

[6]   Although *Millbrook* was a Title VII case, we see no reason why, in the context of this case, a § 1981 claim should be any different.

[7]   We do not mean to suggest that Blise may have been lacking with respect to these traits. Instead we note only that, contrary to her assertion, a job interview's result need not rest solely on objective criteria.

ing more so in our increasingly service-oriented economy. . . . Personal qualities . . . factor heavily into employment decisions concerning supervisory or professional positions. Traits such as 'common sense, good judgment, originality, ambition, loyalty, and tact' often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position."). A subjective analysis of the varying traits of each applicant is entirely appropriate.

### III.

Although Paula Blise was able to make out a prima facie case of discrimination by the defendants in this case, she could not demonstrate that the City of Kenosha's articulated reason for failing to hire her was a pretext. The district court properly granted summary judgment in favor of the City and the individual defendants. The decision of the district court is

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*