# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3155

DENNIS HEALY,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, a municipal
corporation, RICHARD A. RICE,
individually and as Commissioner
of the City of Chicago Department
of Water, JUDITH C. RICE,
individually and as Commissioner
of the City of Chicago Department
of Water, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 6030—**William J. Hibbler**, *Judge.*

———————

ARGUED OCTOBER 27, 2005—DECIDED JUNE 16, 2006

———————

Before RIPPLE, KANNE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Dennis Healy, a licensed stationary
engineer employed by the City of Chicago Department of
Water ("DOW"), filed this action under 42 U.S.C. § 1983
against the City of Chicago ("City") and current and former

City employees Francis Blake, John Bolden, Edward Laird, Russell Miller, Judith Rice and Richard Rice in their official and individual capacities. He claimed that he was denied, in violation of his First Amendment rights,[1] various promotions in retaliation for his repeated complaints of corruption and of other illegal activities at Mayfair Water Pumping Station ("Mayfair"). On July 19, 2004, the district court granted summary judgment in favor of the City, Mr. Blake, Mr. Rice and Ms. Rice. Mr. Healy now appeals. He contends that the district court erred in finding that there was no causal link between his reports of illegal activity and the subsequent denial of promotions. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

#### 1. Reports of Corruption and Theft

Mr. Healy has been employed by the City of Chicago Department of Water ("DOW") for over twenty-five years. From 1981 to 1985, he was employed as a stationary fire-

---

[1]   Count II of Mr. Healy's complaint alleged that he was denied promotions because he was not an active supporter of the Democratic Party, in violation of his free speech and equal protection rights guaranteed by the Fourteenth Amendment. Count III alleged that this politically motivated discrimination also violated the *Shakman* consent decree. *See Shakman v. Democratic Org. of Cook County,* 569 F. Supp. 177 (N.D. Ill. 1983). The district court granted summary judgment in favor of the defendants on both counts. *See* R.92 at 16-23. Mr. Healy has not challenged this judgment on appeal.

man. In 1985, he was promoted to a Group C Operating Engineer; in 1991, he again received a promotion and became a Group A Operating Engineer. He still holds that position as of the date of this opinion. With the exception of a temporary transfer in 1993,[2] Mr. Healy has been assigned to Mayfair, one of the DOW's steam pumping stations, for the duration of his employment at the DOW.

In 1992, Mr. Healy began complaining to his superiors about allegedly illegal activities occurring at Mayfair. He believed that his co-workers—including the then-Chief Operating Engineer ("COE") of the pumping station—were engaged in theft and sabotage of public property,[3] drinking on the job and fraudulent business practices. He brought these allegations to the attention of a number of offices and individuals. For example, in January 1992, he met with a representative of the City Office of Intergovernmental Affairs. In September 1992, and again in December 1992, he spoke with Mr. Laird, who at that time was the Engineer of Water Pumping. In late 1992 or early 1993, he met with Mr. Bolden, then the DOW Commissioner. During 1992 and 1993, he met numerous times with representatives from the Inspector General's ("IG") Office. Mr. Healy also discussed his concerns with Mayor Richard M. Daley, once in February 1994 and again in October 1998. In 1994, Mr. Healy contacted Mr. Blake, then the acting COE of Mayfair; he maintained communication with Mr. Blake about these issues after Mr. Blake left Mayfair to assume the position of Assistant Water Commissioner in late 1994.

---

[2] Mr. Healy protested this transfer through City grievance procedures. Pursuant to a settlement agreement with the City, he was returned to Mayfair in February 1994.

[3] For example, Mr. Healy believed that his co-workers and supervisors had stolen from Mayfair cooling coils, bricks and scrap steel, among other items.

After October 2, 1998, the beginning of the time period relevant to this appeal,[4] Mr. Healy discussed his concerns about illegal activity at Mayfair with only a few individuals. The first was Judith Rice, the Commissioner of Water from 1996 to November 1999. Mr. Healy submits that he and Ms. Rice held a meeting in late January or early February of 1999, during which they spoke about corruption at Mayfair and his concerns about not having been promoted:

> I met with Judith Rice at her office at the Jardine Plant in late January or early February 1999 for about 20 minutes. Ms. Rice had all my personnel documents on her desk for the meeting and only Ms. Rice and I were present for the meeting. At this meeting, I asked Ms. Rice why I had been continuously passed over for promotion with my qualifications and seniority. I told Ms. Rice that I had many meetings with different people about my complaints of theft and sabotage at Mayfair and that my name was [expletive] because I was blamed for different things. I demanded that Ms. Rice take care of this and that if she needed any information, I would provide it to her. At this meeting, Judith Rice told me that she knew all about me and my work record and that there was no reason why I was not promoted to the position of Assistant Chief Operating Engineer. Ms. Rice told me that I would receive the next promotion to that position.

---

[4] The district court held that all claims accruing before October 2, 1998, were time-barred—a finding that Mr. Healy does not challenge before this court. *See* R.18 (striking as untimely all damages claims stemming from acts occurring before October 2, 1998); *see also id.* at 3-7 (finding that the plaintiff could not proceed under the "continuing violation doctrine").

R.78, Ex.1 at 12 (Healy Aff.); *see also id.*, Ex.2 at 311-14 (Healy Dep.). Ms. Rice denies Mr. Healy's account of their conversation. She contends that she did not

> meet[ ] with Mr. Healy in 1999 as alleged in his complaint. I do recall seeing him once, in passing, as I was leaving my office at the Jardine Filtration Plant while I was Commissioner of the Water Department. I do not recall the date on which this chance encounter occurred. I did not discuss with him any of the allegations contained in his complaint at that time. In addition, I recall having a telephone conversation with Mr. Healy, possibly in 1999, after he had made repeated efforts to contact me by phone. During this phone call, Mr. Healy alleged that he was being treated unfairly and that he had been passed over for promotions, and indicated that the [COE] at the Mayfair Pumping Station where he was employed disliked him. I did not discuss the issues Mr. Healy raised, but instead referred him to Francis Blake . . . . I have no knowledge of . . . the alleged complaints of criminal misconduct at the Mayfair Pumping Station.

R.75, Ex.R at 2-3 (Judith Rice Aff.); *see also* R.78, Ex.4 at 30 (Judith Rice Dep.) (explaining that, during their encounter in the hallway, Mr. Healy complained that "he wasn't being treated fairly; he had been passed over; the guys didn't like him; things like that").

In 1999, Mr. Healy again contacted the IG's Office. On October 13, he submitted a complaint, alleging that "employees who work for [Mayfair] stole copper and equipment [from] the Department of Water in 1993 and 1994." Case Initiation Report, R.75, Ex.N. The IG's Office conducted interviews of relevant individuals, but from the record it does not appear that any remedial action was taken.

In addition, as we noted earlier, Mr. Healy maintained contact with Mr. Blake after he left Mayfair in 1994 to assume the position of Assistant, and then Deputy, Water Commissioner. The two met face-to-face in January 2000. According to Mr. Healy, they discussed his concerns of corruption at Mayfair, as well as his related allegations of retaliation. Mr. Blake allegedly responded to Mr. Healy's concerns about being passed over for promotions as follows:

> [W]e talked that morning, probably 50 minutes to an hour. And I—and I asked him what part [City Hall] didn't understand, and he told me that I spoke too clearly, and he said they didn't like the way it was done. And that he said it comes from the top down, it doesn't come from the bottom up. . . . And he said there's a political system, that's the way it works. . . . [A]nd he also said the Fifth Floor [of City Hall]. That's how things work. It's a political system. It works from the top down.

R.78, Ex.2 at 534 (Healy Dep.). Although Mr. Blake admits knowing of Mr. Healy's reports of corruption and concerns regarding promotional opportunities, he denies having made these statements to Mr. Healy. *See, e.g., id.*, Ex.3 at 157-58 (Blake Dep.).

## 2. Promotional Opportunities

Mr. Healy claims that, during this same time period and in retaliation for his reports of public corruption, he was denied five promotions to Assistant Chief Operating Engineer ("ACOE")[5] and Chief Operating Engineer

---

[5] ACOE is the position immediately above the Group A Engi-
(continued...)

("COE").[6] We begin by discussing the DOW's promotion and interview procedures; we then turn to discuss Mr. Healy's specific claims.

The DOW employs a multi-stage procedure for interviewing and promoting employees. At the beginning of each year, the Deputy Commissioner of the DOW prepares a hiring plan, which lists program vacancies and is distributed to current employees. The City Department of Personnel ("DOP") is responsible for determining whether a current employee meets the "minimum qualifications for a position, and if so, the DOP places that person on the eligibility list for that position." R.75, Ex.P at 1 (Falcon Aff.). The Deputy Commissioner then selects a three-person interview committee, which is responsible for conducting interviews of persons eligible for the position. Interviewers independently fill out a rating sheet for each candidate, assigning him or her a numerical score. These sheets then are given to the Deputy Commissioner who summarizes and tabulates the scores, compiles a list or spreadsheet of the numerical rankings, and recommends to the DOP, based upon those rankings, candidates for promotion. The DOP conveys this information to the DOW Commissioner, who

---

[5] (...continued)
neers, the title currently held by Mr. Healy. There are usually four ACOEs assigned to each pumping station.

[6] Mr. Healy also claims he suffered a number of adverse employment actions prior to 1998 in retaliation for his willingness to speak openly about corruption at Mayfair. For example, he was transferred to the midnight shift; received unwarranted reprimands; was denied numerous pre-1998 promotions; and was suspended for a brief period. These claims, however, fall outside the relevant statutory limitations period and will not be considered by this court as a basis for liability.

ultimately is responsible for selecting the candidate(s) most appropriate for promotion.[7]

The first promotion decision relevant to this appeal occurred in August 1998. Mr. Healy submitted an application for four open ACOE positions. He was deemed minimally qualified for the positions and was placed on the bid list. He was one of 21 applicants interviewed for the four positions by a three-person interview panel. The three persons sitting on the interview panel had been selected by the Deputy Commissioner, Mr. Blake, and were employed by the DOW as ACOEs. Based exclusively on his average interview score, Mr. Healy was ranked 12th by the panel. The panel recommended for promotion the four candidates with the best interview scores. Commissioner Judith Rice approved this recommendation on August 26, 1998.

Mr. Healy again applied for open ACOE positions in November 1998. He was one of 30 candidates interviewed for six positions by an interview panel selected by Mr. Blake, which consisted of three COEs. Based on his average interview score, Mr. Healy was ranked 14th by the panel. The six top-scoring applicants were offered promotions, receiving both Mr. Blake and Ms. Rice's approval.

Mr. Healy's third interview, in late November 1998, was for the position of COE. He was one of 17 people interviewed for two available positions. The panel consisted of two current COEs and the Engineer of Electrical Pumping. Mr. Healy was ranked 14th based on his interview score; he did not receive a promotion. Mr. Blake, after receiving the recommendations of the interview panel, concurred with the panel's findings and passed on its recommendations to

---

[7] *See also* R.78, Ex.3 at 153-56 (Blake Dep.) (describing the DOW's promotion process).

the Commissioner. The promotion of the two individuals with the highest interview scores subsequently was approved by Ms. Rice.

Mr. Healy next interviewed for a promotion to ACOE in May 2000. The interviews were conducted by a panel consisting of a Deputy Commissioner and two COEs. Mr. Healy was one of 19 candidates, was ranked 16th by the interview panel and did not receive the promotion. There were two positions available; the two candidates with the highest interview scores were promoted.

The last interview was conducted in July 2000 for one open ACOE position. The interview panel consisted of a COE, an ACOE and a Deputy Commissioner. Mr. Healy was ranked seventh out of eight applicants and did not receive the promotion. The candidate with the highest interview score was recommended for a promotion by the interview panel and by Mr. Blake. Mr. Rice approved this recommendation on July 31, 2000.

Although neither Mr. Blake nor Ms. Rice were present at any of these interviews, they both were involved in the promotion process. As Deputy Commissioner, Mr. Blake participated in the selection of the interview panels and in the tabulation and preparation of the scores and recommendations for the DOP and the Commissioner. Ms. Rice, the Commissioner from June 1996 to late October 1999, approved the choice of candidates for three of the five promotions in question, accepting the recommendations of the interview panel for all three job openings. Mr. Rice became the DOW Commissioner in November 1999 and was accountable for promotion decisions thereafter.

**B. District Court Proceedings**

In October 2000, Mr. Healy filed the present action against the City and against Mr. Blake, Mr. Bolden, Mr. Laird, Mr. Miller, Ms. Rice and Mr. Rice in their individual and official capacities. *See* 42 U.S.C. § 1983. In pertinent part, he contended that he was denied five promotions in retaliation for his reports of illegal activity at Mayfair in violation of his First Amendment right to free speech. He also claimed that, because of his protected speech about corruption at Mayfair, he was barred from attending safety meetings at the DOW.

The district court dismissed as time-barred all claims that stemmed from allegedly discriminatory conduct occurring before October 2, 1998—the beginning of the applicable two-year limitations period. The statute of limitations therefore barred all claims against Mr. Miller and Mr. Laird. *See* R.18 at 8 (finding that Mr. Healy failed to allege that Mr. Miller and Mr. Laird had "committed any discriminatory acts since October 2, 1998").[8] The district court subsequently also dismissed Mr. Healy's claims against Mr. Bolden as time-barred. *See* R.22. The district court's findings on these matters have not been challenged on appeal.

On December 2, 2003, the remaining defendants filed a motion for summary judgment. The district court granted this motion on July 19, 2004. As an initial matter, the court noted that the test for a First Amendment claim of retaliation is three-fold: (1) whether the plaintiff's speech was constitutionally protected; (2) whether the defendant's

---

[8] In this same order, the district court also dismissed Mr. Healy's damages claims against the defendants in their official capacities. *See* R.18 at 16-17 (although denying the defendants' motion to dismiss Mr. Healy's request for injunctive relief against the defendants in their official capacities).

employment action was motivated by the constitutionally protected speech; and (3) whether the defendant would have taken the same action in the absence of the plaintiff's speech. Although concluding that Mr. Healy's reports of illegal activity at Mayfair touched on a matter of public concern, and that Mr. Healy's "interest in commenting upon matters of public concern outweighed the interests of Defendants, his employer," R.92 at 9-10, the district court found no genuine issue of material fact on the question of causation. In the district court's view, there was no evidence that Mr. Rice "knew of Healy's protected speech or of the alleged retaliation." *Id.* at 11. The district court also wrote that, although Mr. Healy previously had spoken with Ms. Rice about his failure to be promoted, there was no evidence that they had ever spoken specifically about corruption or theft at Mayfair, or that she otherwise knew of Mr. Healy's reports of illegal activities at Mayfair. Lastly, although Mr. Blake "knew of Healy's complaints of corruption and his complaints of retaliation," *id.* at 12, he had no substantive influence over the relevant promotion decisions:

> The evidence establishes that the DOW Commissioners did not consult with Blake before making their promotion decisions, and they always chose those with the highest interview scores, which was never Healy. There is also nothing in the record to show that Blake did anything to affect either the decision of the panel or the interview scores.

*Id.* at 13 (internal citations omitted). The district court dismissed as irrelevant and unsubstantiated Mr. Healy's account of his January 2000 meeting with Mr. Blake, in which Mr. Blake allegedly told Mr. Healy that the reason he had not received a promotion was because of "politic[s]." *Id.* at 13-14.

Lastly, the district court found that, even in the absence of Mr. Healy's exercise of his First Amendment rights, the defendants likely would have denied him all five promotions. Promotion decisions at the DOW are based primarily, if not exclusively, upon interview scores, and Mr. Healy simply did not score well on the interview portion of the promotion process.

In the absence of evidence that Mr. Rice, Ms. Rice or Mr. Blake had violated Mr. Healy's rights, the court concluded that the City of Chicago could not be held vicariously liable for the adverse employment actions at issue.

## II

## ANALYSIS

We review the district court's grant of summary judgment de novo. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1012 (7th Cir. 2006). In doing so, we construe all facts and reasonable inferences in the light most favorable to Mr. Healy, the non-moving party. *Id.* Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

A party claiming retaliation based upon the First Amendment must create a genuine issue of material fact that: (1) "[his] speech was constitutionally protected"; and (2) the defendants' "actions were motivated by [his] constitutionally protected speech." *Smith v. Dunn*, 368 F.3d 705, 708 (7th Cir. 2004); *see also Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.,* 278 F.3d 693, 699 (7th Cir. 2002). If Mr. Healy fulfills these two requirements, the burden shifts to

the defendants to establish by a preponderance of the evidence that Mr. Healy would not have been promoted "in the absence of his exercise of his rights under the First Amendment." *Vukadinovich,* 278 F.3d at 699. If the defendants carry this burden, Mr. Healy then "bears the burden of persuasion to show that [the defendants'] proffered reasons were pretextual and that discrimination was the real reason for the [employment action]." *Smith,* 368 F.3d at 708.

The only issue raised before this court is whether Mr. Healy has presented evidence substantiating the causal link between his protected reports of corruption in his workplace and the subsequent adverse employment actions taken by Ms. Rice and Mr. Blake individually and the City as a

municipal entity.[9, 10]


## A.  Judith Rice

Mr. Healy first contends that the district court erred in finding that there was no evidence that Ms. Rice knew of his reports of illegal activity at Mayfair. The district court concluded that, although Ms. Rice may have met with Mr. Healy in January or February of 1999 and discussed at that

---

[9]   Mr. Healy does not challenge the district court's finding that the ban on attending safety meetings was not discriminatory. *See* Appellant's Br. at 11 (mentioning safety meetings only once, when discussing the facts of the case). The district court held that Mr. Healy's claim that, in retaliation for his reports of corruption to his supervisors, he was told not to attend safety meetings was not supported by the evidence. *See* R.92 at 15 (noting in particular that Mr. Healy admitted in his deposition that he in fact did attend safety meetings in both 1998 and 1999).

Nor does he challenge the district court's conclusion that Mr. Rice, Ms. Rice's successor as the Commissioner of Water, cannot be held liable for retaliation because he was not aware of Mr. Healy's reports of corruption. *See id.* at 11 (holding that Mr. Healy does not allege that he ever spoke directly with Mr. Rice about his claims of corruption at Mayfair, and noting that there is no other evidence that Mr. Rice knew of Mr. Healy's concerns). The district court's summary judgment order as it relates to Mr. Rice's liability is not discussed by Mr. Healy in his brief before this court.

[10]   Neither party addresses the issue of whether Mr. Healy's statements about corruption are protected by the First Amendment. We therefore have no occasion to address this issue, including whether Mr. Healy's statements in any way were required by his official duties. *See Garcetti v. Ceballos,* 126 S.Ct. 1951, 2006 WL 1458026 (2006).

time his complaints of being denied various promotions, "Healy does not claim, and [Ms.] Rice does not recall, that Healy complained of corruption at Mayfair." R.92 at 11. By contrast, Mr. Healy claims in his brief that "he informed [Ms.] Rice of alleged theft at Mayfair during [the 1999] meeting, although the District Court erroneously concluded that Healy had not claimed he reported corruption at Mayfair to [Ms.] Rice." Appellant's Br. at 18.

In his deposition, Mr. Healy testified that he told Ms. Rice about events of employee misconduct at Mayfair before 1993. *See* R.78, Ex.2 at 311-12 ("[T]hings weren't being done. I was guaranteed that she was aware of the problem with Miller, and I just wanted to make sure. It just seemed like nothing was getting done. . . . I explained to her that I had different meetings, different people, and that I was told that, you know, my name is [expletive] and that I was blamed for different things."). But he admits that he did not "complain to [Ms.] Rice about anything that had happened since June of 1993." *Id.* at 312. In his affidavit, he states: "I told Ms. Rice that I had many meetings with different people about my complaints of theft and sabotage at Mayfair and that my name was [expletive] because I was blamed for different things." *Id.*, Ex.1 at 12. The affidavit contains nothing more specific with respect to the time frame of these complaints, specific individuals contacted or events discussed with Ms. Rice.

Even if Mr. Healy and Ms. Rice did meet and did discuss corruption at Mayfair or Mr. Healy's fears of retaliation for his reports of wrongdoing, as Mr. Healy now claims, Mr. Healy cannot demonstrate that this conversation had an effect on subsequent promotion decisions. After the meeting, which Mr. Healy claims occurred in either late January or early February of 1999, he was denied only two promotions: one in May 2000; the other in July 2000. Ms. Rice,

however, resigned from her position as DOW Commis-
sioner in late October 1999. Thus, between January 1999 and
her resignation ten months later, she neither made nor
ratified a single employment decision affecting Mr. Healy,
including the denial of promotions in 2000. Mr. Healy
responds that he "interviewed for a promotion in September
or October of [1999]." Appellant's Br. at 19; *see also* R.78,
Ex.2 at 315 (Healy Dep.). There is simply no evidence to
support this contention. According to the record, hiring for
both of the 2000 promotions did not commence until
months after Ms. Rice's resignation. For the May 2000
ACOE promotion, Mr. Healy submitted his application and
was deemed minimally qualified for the position in mid-
April 2000. Interviews were conducted on May 12, May 16
and May 17 in the year 2000. The interview panel's recom-
mendations were approved by Mr. Rice on June 7, 2000.

Hiring for the July 2000 promotion also began in April
2000. A bid list of minimally qualified candidates was
prepared on April 18, 2000. Interviews were conducted on
June 19, 2000. Mr. Rice offered the top-ranking candidate a
promotion on July 31, 2000. In sum, there is no evidence that
hiring for either position began before Ms. Rice's resigna-
tion, or that she, post-resignation, influenced her successor's
choice of candidates for promotion.

Mr. Healy submits, however, that Ms. Rice was aware of
his reports of corruption before their January or February
1999 meeting and influenced the promotion decisions
prior to that date. According to Mr. Healy,

> [Ms.] Rice admitted to having knowledge of theft and
> corruption by other Water Department employees . . . .
> There is no evidence in the record to show that anyone
> else besides Healy made reports of theft and corruption.
> Therefore, the District Court should have drawn the
> reasonable inference that [Ms.] Rice knew Healy had
> made the complaints of corruption.

Appellant's Br. at 19. Mr. Healy's bare allegations are insufficient to survive summary judgment. His argument is entirely speculative. Indeed, even if Ms. Rice generally was aware of problems at Mayfair, there is no proof that she knew specifically that Mr. Healy, as opposed to another individual, had complained to his supervisors of corruption at Mayfair. *Cf. Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not sufficient that [the defendant] *could* or even *should* have known about [the plaintiff's] complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory." (emphasis in original)); *Miller v. American Family Mut. Ins. Co.,* 203 F.3d 997, 1008 (7th Cir. 2000) ("[A]n employer cannot retaliate when it is unaware of any complaints."). Nor can an inference of knowledge or retaliation be drawn from the circumstances. Although Ms. Rice admits to general knowledge of theft and corruption at Mayfair, neither party identifies the date on which she acquired such knowledge; Mr. Healy does not even suggest, much less offer evidence to support the claim, that Ms. Rice knew of these issues prior to November 1998—the date of the last promotion decision before Ms. Rice resigned as Water Commissioner.

Moreover, even if the record contained direct evidence establishing that Ms. Rice knew of Mr. Healy's complaints of corruption and theft prior to November 1998, that evidence, standing alone, would not justify the denial of summary judgment. We have held under similar circumstances that, "as a matter of law, mere knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive." *Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999).[11]

---

[11] *Sanchez* and other cases have recognized that, although "mere
(continued...)

Here, there is no evidence that Ms. Rice played a role in the formation of the interview panels. Nor is there any evidence, and Mr. Healy does not contend, that these panels acted as Ms. Rice's "cat's paw," *Byrd v. Illinois Dep't. of Pub. Health*, 423 F.3d 696, 708 (7th Cir. 2005), in their ranking of Mr. Healy far down the list of candidates. Mr. Healy simply has not substantiated factually his claim that his failure to be promoted is traceable to a "retaliatory motive" on the part of Ms. Rice. *Sanchez*, 188 F.3d at 747. This failure to supply evidence in response to the motion for summary judgment is dispositive.

## B. Francis Blake

Mr. Healy next challenges the district court's finding that, although Mr. Blake was aware of Mr. Healy's reports of corruption and theft at Mayfair, there was no evidence that Mr. Blake affected the Commissioner's promotion decisions. Mr. Healy invites our attention to two pieces of evidence, which he believes indicate that Mr. Blake harbored retaliatory animus towards him, and, as a result, intentionally influenced the promotion process: First, in response to Mr. Healy's inquiries about why he had not been promoted, Mr. Blake allegedly stated that promotion decisions come from the "top down" or from the "Fifth Floor" of City Hall. R.78, Ex.2 at 534 (Healy Dep.). Second, Mr. Blake allegedly told

(...continued)

knowledge" may not satisfy the plaintiff's burden, "suspicious timing can raise an inference of discrimination sufficient to satisfy the causation element of the prima facie case." *Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999). Here, however, the timing of events is not "suspicious": Even if Ms. Rice did speak with Mr. Healy in January or February 1999, the next adverse employment action did not occur until more than a year later.

Mr. Healy that the reason he had not been promoted was because "there's a political system, that's the way it works.é *Id.*

These submissions are weak reeds indeed on which to support a retaliation claim. The first comment, which blames promotion decisions on bureaucratic processes or a group of unnamed persons at City Hall, tends to absolve Mr. Blake of any personal responsibility for promotion decisions, rather than demonstrate any active role on his part in those decisions. The second might be relevant to Mr. Healy's claim that he was not promoted because of his political affiliations, but it does not support the particular retaliation claim that he presents in this court. Notably, Mr. Healy has not pursued his *Shakman* or equal protection claims on appeal.

Even if these comments could be construed to demonstrate that Mr. Blake harbored retaliatory animus toward the plaintiff, there is no triable issue of fact on the question of whether Mr. Blake was responsible for the adverse employment action suffered by Mr. Healy. Mr. Healy consistently was ranked low by the interview panels, and the record compels the conclusion that he was denied promotions because of poor interview skills rather than because of his reports of theft and corruption at Mayfair.[12] For example, for

---

[12] Mr. Healy responds that his extensive experience at the DOW demonstrates that he was qualified for a promotion to ACOE. However, he admits that experience is only one factor that the Commissioner takes into account when selecting candidates for promotion. Moreover, this court "do[es] not sit as a superpersonnel department where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." *Blise v.*
(continued...)

the August 1998 promotion, Mr. Healy was ranked 12th out of 21 applicants based on his average interview score; only the four top-scoring candidates were offered promotions. For the November 1998 ACOE promotion, Mr. Healy was ranked 14th out of 30 applicants; only the top six candidates, based on their interview scores, were promoted. For the November COE 1998 promotion, Mr. Healy was ranked 14th out of 17 applicants; the applicants with the top two interview scores were promoted. Similarly, in July 2000, Mr. Healy was ranked 16th out of 19 applicants; the City promoted the two applicants who achieved the highest interview scores. In July 2000, he was ranked seventh out of eight applicants; only the top-scoring candidate was promoted.

Moreover, even if Mr. Healy is correct that Mr. Blake had an opportunity to affect the Commissioner's promotion decisions, the record demonstrates that Mr. Blake did not capitalize upon this opportunity. For each of the promotion decisions in which he had any part, Mr. Blake's recommendations to the DOP mirrored precisely the recommendations of the interview panel. As demonstrated by his letters to the Commissioner, he simply summarized the results of the interviews and ranked the candidates, premised in significant part on the scores assigned by the interview panel. *See, e.g.,* Blake Memo., R.75, Ex.Q, Tab 3 at 7 ("I concur with the findings of the [interview] panel and recommend that the

---

[12] (...continued)

*Antaramian,* 409 F.3d 861, 868 (7th Cir. 2005) (internal quotation marks omitted); *Holmes v. Potter,* 384 F.3d 356, 361-62 (7th Cir. 2004). Even if the individuals selecting candidates for promotion *should have* promoted Mr. Healy because of his superior experience, there is no evidence that the reason they did not do so is because of his protected speech—rather than because his interview scores did not pass muster.

six positions be offered to [the six candidates selected by that panel].”). Ultimately, in the case of all five promotions, for a total of sixteen open positions, the candidates recommended by Mr. Blake and promoted by the Commissioner were the candidates with the highest interview scores. The record evidence at the very most raises a “metaphysical doubt” about Mr. Blake’s possible discriminatory animus. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (holding that the non-moving party “must do more than simply show that there is some metaphysical doubt as to the material facts” to survive summary judgment). It simply would not support a jury verdict in Mr. Healy’s favor on his retaliatory discharge claim.

Mr. Healy criticizes the district court’s reliance on interview results; he contends that the scores assigned by the panels were themselves discriminatory. He submits that Mr. Blake “ratified decisions made by those who held a discriminatory animus towards Healy,” primarily members of the interview panels. Appellant’s Br. at 22. Mr. Healy, however, presents us with no factual basis for his allegation that the interviewers harbored “a discriminatory animus” toward him. *Id.* Indeed, he identifies no evidence that any of the members of post-1998 interview panels even *knew of* Mr. Healy’s reports of corruption, much less that they were motivated by those reports in scoring the candidates.[13]

---

[13] Mr. Healy deposed only three of the many members of the interview panels: two from pre-1998 interview panels and one who participated on an interview panel for a post-1998 promotion. The first, Tom Special, a COE at Mayfair, sat on a pre-1998 panel that interviewed Mr. Healy for a promotion. He described this interview in his deposition as “interesting,” explaining that “Mr. Healy at some point near the end of the interview launched into a discussion of things going on at, I believe, Mayfair at the

(continued...)

(...continued)

time. . . . [W]e were all looking at each other like, what's this got to do with the interview?" R.78, Ex.5 at 59-60.

At most, Special's testimony demonstrates that, unprovoked, Mr. Healy inappropriately raised his concerns about corruption and theft at Mayfair during an interview. It does not establish that Special or other members of the interview panels chose to not promote Mr. Healy because of his First Amendment activities. *Id.* at 80 (specifying that the interview was strange because Mr. Healy expressed concerns that were unrelated to questions asked by the panel); *see also id.* at 62 (explaining that Mr. Healy had difficulty answering standard interview questions, including one "pertaining to electric plants operation"). Moreover, even if Special's testimony does prove that his motives were improper, there is no evidence that Special influenced post-1998 promotion decisions.

Second, Mr. Healy deposed Rob Cannatello. *See id.,* Ex.10. Like Special, Cannatello did not sit on any of the five interview panels relevant to this appeal and there is no evidence that he influenced the post-1998 promotion decisions at issue in this appeal. Moreover, the portions of the deposition testimony attached to the plaintiff's response to the motion for summary judgment do not indicate that Cannatello harbored retaliatory animus towards Mr. Healy or that he even knew of Mr. Healy's reports of corruption at Mayfair.

Mr. Healy also deposed Dominick Cantore, Jr., a member of the interview panel for the November 1998 promotion, as well as for the December 1998 promotion. *See id.,* Ex.19. Cantore, however, was not asked in his deposition whether he was aware of Mr. Healy's reports of corruption and theft at Mayfair. Nor did he give any indication that his or his colleagues' decisions were influenced in any way by Mr. Healy's activities. *Id.*

Mr. Healy points to no other evidence in the record that demonstrates a discriminatory motive or knowledge of his

(continued...)

Mr. Healy also submits that the interview scores were "subjective," that the questions asked of candidates were inconsistent and that the questions asked of him specifically were irrelevant and too personal.[14] Appellant's Br. at 24-25. It does appear that the DOW prepared a standard list of questions that the interviewers were to ask of all candidates for each position opening.[15] *See also* R.78, Ex.5 at 65 (Special

---

(...continued)
complaints on the part of interviewers.

[14] For example, in his deposition, Mr. Healy recounted one of his interviews as follows:

> The only thing is I would—you know, I talked to some people that interviewed and they'd have—they'd have like different questions, but, you know, some people would be asked six to eight things, some people—I mean, some interviews, it was like three or four questions.
>
> . . .
>
> Now—the one question was, Did you put down who to call in case of emergency? You know, like what does that have to do with—it had nothing to do with steam experience, you know?

R.78, Ex.2 at 386-87; *see also id.* at 383-84 (recounting that one interviewer asked him what he would do if "someone came to work drunk"); *id.* at 386-89 (describing other allegedly abnormal questions asked of him at various interviews, including questions about the weather).

[15] For example, for the August 1998 ACOE promotion, the interview panel was given a list of nine questions to ask of candidates, with sample answers. *See* R.75, Ex.Q, Tab 1 at 12. For the November 1998 COE promotion, the panel was given a list of seven questions to ask of candidates, which ranged from, "[T]ell

(continued...)

Dep.) (testifying that the "same questions" were asked of "each candidate"). Mr. Healy alleges that he was asked only five of the nine "standard" questions in his August 1998 ACOE interview; only four of the seven questions in his November 1998 COE interview; only four of the ten questions in his November 1998 ACOE interview; and only five of the twelve questions in his July 2000 ACOE interview. *See id.*, Ex.1 at 3-5 (Healy Aff.).

However, there is no evidence that other, similarly situated candidates were consistently asked these omitted stock questions. Nor is there evidence implicating Mr. Blake in any wrongdoing. The City provided each interviewer a list of questions to ask each candidate. That Mr. Healy may not have been asked all or some of these questions by the members of the interview panel, in the absence of any indication that Mr. Blake requested or mandated that the interviewers depart from the standard list of questions, is the fault of the interviewers, not of Mr. Blake. Moreover, as

---

(...continued)
us about your background as an operating engineer," to, "[W]hy do you believe that you are qualified[?]" *Id.*, Ex.2 at 6. The same is true of the November 1998 ACOE promotion; there was a list of ten questions provided to the interview panel. *Id.*, Ex.3 at 9 (including questions about the candidate's background, as well as technical knowledge about "speed pump[s]," "centrifugal pump[s]" and "flooding condenser[s]"). For the July 2000 interview, twelve questions were provided to the interview panel. *Id.*, Ex.5 at 7.

The record is unclear as to whether the interview panel was given a list of interview questions for the May 2000 interviews. Three separate documents were produced by the DOW, each containing a number of questions purportedly asked of interviewees. *Id.*, Ex.4 at 7-9.

already discussed, there is no evidence that the interviewers were aware of Mr. Healy's reports of theft and corruption at Mayfair—much less that they were *motivated* in the asking of questions and the scoring of candidates by his First Amendment activities.[16]

## C. Municipal Liability

Because Mr. Healy has failed to demonstrate that persons with policymaking authority over promotion decisions retaliated against him on the basis of his reports of corruption and theft at Mayfair, we need not address Mr. Healy's municipal liability arguments. In the absence of evidence of wrongdoing carried out by City employees, the City may not be held vicariously liable. *See Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) (explaining that, for a municipal corporation to be held liable under § 1983, there must be an "express policy," a "widespread practice" of retaliation or "constitutional injury . . . caused by a person with final policymaking authority").

---

[16] The defendants cite *Blise v. Antaramian,* 409 F.3d 861, 868 (7th Cir. 2005), for the proposition that the subjective evaluation of candidates is "entirely appropriate," given that personal qualities factor heavily in many employment decisions. *Blise,* however, is inapposite. Although, as we explained in *Blise*, there is no requirement that all job applicants be asked the same questions, when the employer sets forth a standard list of questions to be asked of candidates, a departure from that standard is suspicious.

We need not reach whether, in this case, the questions asked of Mr. Healy create a triable issue of fact concerning whether the interviewers acted in a discriminatory manner. Absent evidence supporting the allegation that the interviewers knew of Mr. Healy's complaints, and absent evidence that Mr. Blake knew of and encouraged the panel's departure from stock questions, Mr. Healy has failed to sustain his burden of production.

**Conclusion**

The district court properly found that the plaintiff did not present sufficient evidence that his reports of wrongdoing in his workplace were a motivating factor in the defendants' adverse employment decisions. We affirm the district court's grant of summary judgment in favor of the defendants.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*