IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Willie J. NUNNERY, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Respondent,

v.

Willie J. NUNNERY, Respondent-Appellant.

IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Willie J. NUNNERY, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Appellant-Cross-Respondent,

v.

Willie J. NUNNERY,
Respondent-Respondent-Cross-Appellant.

Supreme Court

*Nos. 2006AP1191–D & 2007AP1908–D.*
*Oral argument May 22, 2009.*
*—Decided July 21, 2009.)*

2009 WI 89

(Also reported in 769 N.W.2d 858.)

For the respondent-appellant there were briefs by *Willie J. Nunnery,* and oral argument by *Willie J. Nunnery.*

For the complainant-respondent there were briefs by *Julie M. Falk* on behalf of the *Office of Lawyer Regulation,* Madison, and oral argument by *Julie M. Falk.*

¶ 1. PER CURIAM. We review the findings of fact, conclusions of law and recommendations for sanctions

in two lawyer disciplinary proceedings which are consolidated for purposes of this appeal. In both cases, Attorney Willie J. Nunnery was found to have engaged in unprofessional conduct in his practice of law. In Case No. 2006AP1191–D, the referee, Rose Marie Baron, recommended Attorney Nunnery's license to practice law in Wisconsin be suspended for six months and that he pay the costs of the disciplinary proceeding. In Case No. 2007AP1908–D, the referee, Kevin Ferguson, recommended Attorney Nunnery's license be suspended for two years and that he pay the costs and restitution.

¶ 2. Attorney Nunnery appeals in Case No. 2006AP1191–D and cross-appeals in Case No. 2007AP1908–D. With the exception of certain counts, he claims the evidence is insufficient to support both referees' findings and conclusions. He also contends the referees' recommended sanctions are excessive.

¶ 3. In Case No. 2007AP1908–D, the Office of Lawyer Regulation (OLR) filed an appeal challenging the recommended sanction. The OLR argues the appropriate discipline in Case No. 2007AP1908–D should be revocation.

¶ 4. Because the record supports the referees' findings and conclusions in both cases, we adopt them. We determine that Attorney Nunnery's professional misconduct warrants a three-year license suspension, comprised of a six-month suspension in Case No. 2006AP1191–D and a two and one-half year suspension in Case No. 2007AP1908–D. We impose full costs and restitution.

¶ 5. Attorney Nunnery was admitted to the practice of law in Wisconsin in 1976 and in Louisiana in 1985. He practices in Madison. A previous disciplinary proceeding resulted in a two-month suspension of At-

torney Nunnery's license. *See In re Disciplinary Proceedings Against Nunnery,* 2007 WI 1, 298 Wis. 2d 289, 725 N.W.2d 613.

## I.
## *CASE NO. 2006AP1191–D*

¶ 6. In Case No. 2006AP1191–D, the OLR filed a 21–count disciplinary complaint arising from three client matters. Following hearings on seven separate dates, Referee Baron made extensive findings in her 63–page report, concluding the record supported all 21 counts of professional misconduct. ·

A. *The Mr. and Mrs. D. Matter (Counts 1 through 8).*

¶ 7. Eight counts of professional misconduct involve Attorney Nunnery's representation of Mr. and Mrs. D. Attorney Nunnery represented Mr. and Mrs. D. in their alleged discrimination claims relating to the purchase of a home and a bank's subsequent denial of credit. Attorney Nunnery also represented Mr. and Mrs. D. with respect to their claims due to personal injuries they both suffered in an automobile collision with an uninsured driver. Mrs. D. was the driver and Mr. D. was a passenger.

¶ 8. In his appellate brief, Attorney Nunnery does not contest the referee's findings supporting count 5, which charged a conflict of interest by representing both Mr. and Mrs. D. on their individual personal injury claims. Attorney Nunnery also does not contest the referee's findings supporting counts 7 and 8, which charged trust account violations. With respect to the Mr. and Mrs. D. matter, Attorney Nunnery challenges the following counts:

*Count 1:* Former SCR 20:1.5(b);[1] Fees.

¶ 9. Mrs. D. testified to the effect that she and her husband paid Attorney Nunnery a $1,500 retainer to represent them on their real estate discrimination claim, and that he did not explain the basis of his fee nor provide an itemization of the retainer. The referee found Mrs. D. was a difficult and demanding client but for the most part credible. While she may have been inconsistent at times, the referee did not find her untruthful. Mrs. D.'s testimony satisfied the referee that Attorney Nunnery failed to explain the basis of his fees in the real estate discrimination claim.

*Count 2:* Former SCR 20:1.4(a);[2] Communication.

¶ 10. The referee found Attorney Nunnery had no contact with Mr. and Mrs. D. between mid-2002 and February 2005 on their real estate discrimination/denial of credit claims. Mrs. D. testified at length of her frustration when leaving messages at Attorney Nunnery's

---

[1] Effective July 1, 2007, substantial changes were made to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys, SCR Chapter 20. *See* S. Ct. Order 04–07, 2007 WI 4, 293 Wis. 2d xv, 726 N.W.2d Ct.R-45 (eff. July 1, 2007); and S. Ct. Order 06–04, 2007 WI 48, 297 Wis. 2d xv, 730 N.W.2d Ct.R.-29 (eff. July 1, 2007). Because the conduct underlying this case arose prior to July 1, 2007, unless otherwise indicated, all references to Chapter 20 of the Wisconsin Supreme Court Rules will be to those in effect prior to July 1, 2007.

Former SCR 20:1.5(b) provided, "When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."

[2] Former SCR 20:1.4(a) provided a lawyer "shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

office and he would not return her calls. He did not advise Mr. and Mrs. D that one of the parties had been dismissed from the suit. The referee found credible Mrs. D.'s testimony that Attorney Nunnery had never explained the reasons for his conclusion that no viable claim existed.

¶ 11. In addition, Attorney Nunnery did not file a lawsuit against the bank. Therefore, the referee concluded Attorney Nunnery made a misleading statement in his February 9, 2005, letter to his clients. Attorney Nunnery indicated he had included the bank in the lawsuit he filed.[3] The referee concluded the evidence disclosed Attorney Nunnery failed to keep Mr. and Mrs. D. reasonably informed, thus supporting Count 2.

*Count 3:* Former SCR 20:1.4(b);[4] Communication.

¶ 12. The referee further concluded the same conduct gave rise to a violation of SCR 20:1.4(b), which required Attorney Nunnery to explain the discrimination suit to the extent reasonably necessary to permit Mr. and Mrs. D. to make informed decisions. The referee found credible Mrs. D.'s testimony that she believed Attorney Nunnery was pursuing claims against the bank. The referee stated:

> Her lengthy narratives about what she believed Mr. Nunnery should have done [reveal] her utter confusion with the legal procedures in which she was involved.

---

[3] Attorney Nunnery's February 9, 2005, letter stated, "Regarding the [bank] matter and the [seller] matter, a [f]ederal lawsuit was filed in this matter under case no. 01C0908."

[4] Former SCR 20:1.4(b) provided a lawyer "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

Her lawyer had an obligation to explain the reality of the situation in a manner which could be understood by the [clients]. This did not happen.

¶ 13. The referee said Attorney Nunnery did not explain why he did not name the bank as a defendant, nor did he keep Mr. and Mrs. D. informed of his strategy to determine whether a viable claim existed against the bank. Also, the referee said, there was no evidence Attorney Nunnery ever explained the legal effect of the seller's bankruptcy.

*Count 4:* SCR 22.03(6);[5] former SCR 20:8.4(f);[6] Misconduct during the OLR investigation.

¶ 14. During the OLR investigation into Mr. and Mrs. D.'s grievance, Attorney Nunnery advised the OLR that an administrative investigation had not found probable cause with respect to the real estate discrimination claim when in fact the case had been closed due to the complainants' failure to cooperate. Because the agency had never made any substantive findings, the referee determined Attorney Nunnery's response to the OLR constituted a misrepresentation.

¶ 15. Also, the referee concluded, Attorney Nunnery advised the OLR that Mr. and Mrs. D. were fully

[5] SCR 22.03(6) provides:

In the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance.

[6] Former SCR 20:8.4(f) stated it is professional misconduct for a lawyer to "violate a statute, supreme court rule, supreme court order or supreme court decision regulating the conduct of lawyers; . . . ."

aware of the impact of the seller's bankruptcy when in fact Attorney Nunnery had not fully explained this matter to them. Further, the referee determined Attorney Nunnery misrepresented his actions by advising the OLR "an attempt was made to ascertain whether there was any involvement with [the bank] on July 15, 2002." Attorney Nunnery's July 15, 2002, letter to the bank president had merely advised of Attorney Nunnery's intent to add the bank as a party to the discrimination lawsuit and did not raise the denial of credit issue. Although records of the seller's properties had been researched, no evidence tied this research to the bank or to the denial of credit.

*Count 6:* Former SCR 20:1.8(e);[7] Prohibited transactions.

¶ 16. The referee found that when representing Mr. and Mrs. D. on their personal injury claims, Attorney Nunnery advanced them $2,000 on July 21, 2004; $1,125 on March 3, 2005; and $1,000 in December 2005. The referee concluded these transactions were prohibited under former SCR 20:1.8(e).

¶ 17. Each payment was made in advance of a settlement check. The referee found that the $2,000 advance on July 21, 2004, was made before the first settlement check was received on or about August 12, 2004. The referee determined this advance was not

---

[7] Former SCR 20:1.8(e) provided, in pertinent part, as follows:

> A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

> (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; . . . .

within the exceptions found in former SCR 20:1.8(e) but rather for living expenses.[8] The referee concluded the evidence did not support Attorney Nunnery's contention that the matter had been settled before the advance to his clients.

¶ 18. The referee found that the March 3, 2005, payment of $1,125 was also an advance against future settlement proceeds. The insurer offered to settle for policy limits of $25,000 on May 4, 2005. Complications relating to a Medicare lien delayed the settlement until September 2005. On October 11, 2005, Attorney Nunnery forwarded to his clients a check in the amount of $11,221.93 and a copy of the insurance company check to Medicare dated October 10, 2005. The referee found it was clear that the advance was made well before the second settlement check had been received.

¶ 19. The referee found Attorney Nunnery's payment of $1,000 in December 2005 was an advance against the third settlement check. In October 2005 Attorney Nunnery wrote to Mrs. D. indicating he was close to finalizing her settlement with the insurer and asked to meet with her so she could sign additional documents. However, Mrs. D. did not receive her final settlement check until early in 2006. The referee found

---

[8] Mrs. D. testified on June 20, 2007 as follows:

Mr. Nunnery told us we were going to get the money . . . . We was supposed to get our money at a certain time and we had told our landlord that we was going to pay our rent and pay our bills at a certain time, and we didn't have the money, and we was scared we was going to get put out, and we asked him are we going to have our money or we're going to have a world of trouble going on.

And he ended up giving us the $2,000, and he said he'd take it out of your money when you get your money. And it didn't matter right then just as long as we didn't get put out on the street because we was not no rich people.

the $1,000 advance occurred before Mrs. D.'s settlement with the insurer was finalized. The referee noted Attorney Nunnery admitted this ethical violation during his testimony.

## B. *The L.G. Matter (Counts 9 through 15).*

¶ 20. L.G. retained Attorney Nunnery to represent him on a number of claims arising from his employment. The first lawsuit, in which L.G. alleged race discrimination, was voluntarily dismissed and does not provide any basis for discipline. The second and third lawsuits alleged disability discrimination. The second lawsuit was voluntarily dismissed, and the third was administratively closed. Attorney Nunnery's representation of L.G. in the second and third lawsuits gives rise to counts 9 through 15.

*Count 9:* Former SCR 20:1.2(a);[9] Scope of representation.

¶ 21. L.G. testified to the effect that he relied on Attorney Nunnery but was kept in the dark as to the ongoing progress of his lawsuits. L.G. claimed not to have received copies of correspondence, and that his

---

[9] Former SCR 20:1.2(a) provided:

 A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall inform a client of all offers of settlement and abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case or any proceeding that could result in deprivation of liberty, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

phone calls to Attorney Nunnery were rarely returned. Without informing L.G., Attorney Nunnery signed a stipulation for dismissal on January 11, 2005. The referee did not find credible Attorney Nunnery's assertions that from 2005 to 2006 he had various discussions with L.G. regarding his case. The referee determined Attorney Nunnery did not communicate with his client regarding the dismissal of his second lawsuit and did not fully disclose to his client the significance of the administrative closing of the third lawsuit, contrary to SCR 20:1.2(a).

*Count 10:* Former SCR 20:1.3;[10] Diligence.

¶ 22. The referee found that between February and October 2004 Attorney Nunnery ignored five requests from opposing counsel to endorse a stipulation and order of dismissal. The referee found no evidence that Attorney Nunnery's lengthy delays and failure to respond to opposing counsel's requests for dismissal were part of a strategic plan. The referee determined Attorney Nunnery failed to act with reasonable diligence with respect to handling L.G.'s case.

*Count 11:* Former SCR 20:1.4(a); Communication.

¶ 23. The referee determined Attorney Nunnery violated his duty to keep L.G. reasonably informed about the status of his cases. The referee stated:

> Although Mr. Nunnery went on to say that he had various discussions with [L.G.] from 2005 to the summer of 2006, however, the record does not support his assertion. The Stipulation for Dismissal was signed by

---

[10] Former SCR 20:1.3 provided a lawyer "shall act with reasonable diligence and promptness in representing a client."

Mr. Nunnery on January 11, 2005; the Order for Dismissal was dated January 14, 2005, however, as he admitted, Mr. Nunnery did not inform [L.G.] of this action. [L.G.] filed a complaint with OLR sometime in 2005; Mr. Nunnery was advised of OLR's investigation on August 4, 2005. Mr. Nunnery had a meeting with Mr. and Mrs. [L.G.] on November 3, 2005 at which time he refunded [L.G.'s] initial payment of $1,750. He stated in a letter hand delivered at that meeting, "I regret the way this matter was handled." There is no evidence of other contacts until after Mr. Nunnery received a letter from a law firm on behalf of [L.G.] on November 8, 2006. The letter indicated that [L.G.] was unsure of the status of his case and of Mr. Nunnery's representation.

The referee concluded this conduct demonstrated misconduct as charged in count 11.

*Count 12:* Former SCR 20:1.4(b); Communication.

¶ 24. Count 12 arises out of the same conduct. The referee said the record is replete with examples of Attorney Nunnery's failure to explain the legal bases upon which he relied, thus demonstrating a failure to explain a matter to the extent reasonably necessary to permit the client to make informed decisions, contrary to SCR 20:1.4(b).

*Count 13:* Former SCR 20:3.3(a)(1);[11] Candor toward a tribunal.

¶ 25. In a March 24, 2004, letter to the judge in L.G.'s third lawsuit, Attorney Nunnery wrote he had been:

---

[11] Former SCR 20:3.3(a)(1) provided a lawyer shall not "knowingly make a false statement of fact or law to a tribunal; . . . ."

[c]onferring with my client regarding this matter. I have not been able to discuss the merits of the dismissal. I think it may be appropriate simply just to put an indefinite stay on this matter. I hope to have a decision to the court in ten days on a dismissal.

The referee stated L.G. testified credibly he had not conferred with Attorney Nunnery about a possible dismissal and, in fact, L.G. believed the case was still continuing. The referee found that the March 24, 2004, letter violated the duty of candor toward a tribunal.

*Count 14:* Former SCR 20:8.4(c);[12] Conduct involving dishonesty.

¶ 26. On the few occasions when L.G. reached Attorney Nunnery, he told L.G. "everything was fine" and "everything was rolling." The referee concluded that by this conduct, Attorney Nunnery misrepresented to L.G. the status of his disability discrimination lawsuits.

*Count 15:* SCR 22.03(6) and former SCR 20:8.4(f); Misrepresentation during the OLR investigation.

¶ 27. During the OLR investigation, Attorney Nunnery responded to the investigator's questions as follows:

- "I have indicated to [L.G.] that it was very unlikely that he was going to be able to succeed on the merits, and that the defendants will be able to prevail."

- "The county had threatened to file a Motion for Rule 11 in this case based upon [its] summary judgment motion and the expert opinion. I indicated to [L.G.] in a meeting that this was the case."

---

[12] Former SCR 20:8.4(c) stated it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

- "Rather than agree to a stipulated dismissal, the judge imposed an administrative dismissal which permits either party to re-open this case at any time. [There] was no judgment of dismissal entered."

¶ 28. The referee found that at no time did Attorney Nunnery advise L.G. that his case would not succeed but continued to assure him the case was continuing and everything was fine. Also, contrary to Attorney Nunnery's representation to the OLR, he did not provide L.G. with information regarding the defense motion for summary judgment or the meaning of Rule 11 sanctions. Further, the referee found the evidence contradicted Attorney Nunnery's assertion no judgment of dismissal had been entered. An order for a dismissal without prejudice was signed January 14, 2005. This evidence persuaded the referee that during the course of the OLR investigation, Attorney Nunnery willfully failed to provide relevant information, answer questions fully, and made misrepresentations.

## C. *The A.S. Matter (Counts 16 through 21).*

¶ 29. A.S. retained Attorney Nunnery in February 2003 to represent her on a claim against her former employer, the United States Postal Service (USPS). This matter gave rise to counts 16 through 21.

*Count 16:* Former SCR 20:1.5(b); Fees.

¶ 30. A.S. testified she understood the fee arrangement as an "initial deposit and you know, additional fees, his hours accrued." Attorney Nunnery claimed he took the case on a flat-fee basis and A.S. understood that the fee was a "flat fee." The referee concluded that if Attorney Nunnery had attempted to communicate a flat fee,

there would be no reason for him to include a statement as to his $250 hourly rate. Thus, the referee found, Attorney Nunnery left open the possibility of additional billing. The referee determined Attorney Nunnery failed to provide A.S., who was a client not previously represented, with a clear statement of the basis or rate of his fee.

*Count 17:* Former SCR 20:1.1;[13] Competence.

¶ 31. The referee found that due to Attorney Nunnery's failure to reduce to writing the USPS's agreement with respect to A.S.'s return to work, he was unable to enter the agreement on the record, thus depriving her of the ability to enforce the settlement reached with the USPS. Also, the referee determined the decision to withdraw A.S.'s appeal in the matter was not a joint decision on the part of Attorney Nunnery and his client. Rather, A.S. learned that her appeal had been dismissed only when she received notice sent by the Merit Systems Protection Board on June 12, 2003. Due to Attorney Nunnery's dismissal of her appeal and his failure to place the settlement on the record, A.S. was deprived of her ability to reopen her appeal. The referee concluded this conduct violated the duty to provide competent representation.

*Count 18:* Former SCR 20:1.2(a); Scope of representation.

¶ 32. The referee said Attorney Nunnery did not place any weight on his client's concerns, which were

[13] Former SCR 20:1.1 provided, "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

based on her years of experience and knowledge of procedures at the USPS. He did not follow her warning that it would be necessary to have more than the notice that her removal from service had been rescinded. A.S. desired details about when and where she should return to work, whether she would need to serve a probationary period, and whether she would receive back pay for an administrative leave. The referee rejected Attorney Nunnery's contention that he acted reasonably in securing his client's back pay. Although Attorney Nunnery did represent A.S. at a meeting and was instrumental in filing an appeal, he was not instrumental in obtaining compensation for her administrative leave beginning April 26, 2003, which she did not receive until after she complained to Senator Russ Feingold's office.

*Count 19:* Former SCR 20:1.3; Diligence.

¶ 33. The referee said that at the time Attorney Nunnery initiated the dismissal of her appeal, A.S. was not back to work, had not been notified of the time or place to return to work, and had not received her administrative leave pay. Even Attorney Nunnery believed the issue of her compensation had not yet been resolved. Thus, the referee rejected Attorney Nunnery's contention he had fulfilled his obligation to his client when USPS's oral commitment had not been fully carried out. The referee noted A.S.'s testimony regarding the numerous occasions when she telephoned and left messages at Attorney Nunnery's office but he failed to promptly respond. The referee said these actions supported a finding of lack of diligence.

*Count 20:* Former SCR 20:1.4(a); Communication.

¶ 34. The referee concluded Attorney Nunnery did not keep A.S. apprised of what was happening in her

appeal or with respect to his futile attempts to assist her in resolving her administrative leave compensation and job assignment. The referee determined Attorney Nunnery offered no reasonable explanation for his failure to inform A.S. he was withdrawing her appeal.

*Count 21:* Former SCR 20:1.16(d);[14] Terminating representation.

¶ 35. The referee found that in a September 22, 2003, letter, A.S. wrote to Attorney Nunnery expressing dissatisfaction with the way her case had been handled and asking him to contact her. A.S. testified Attorney Nunnery never communicated with her after she sent this letter, and she never received any word from him indicating whether his representation would continue. The referee said "[o]ther than telling [his client] to return to work after she received an AWOL [absent without official leave] notice, he took no effective action on her behalf." The referee found no evidence that Attorney Nunnery told A.S. if she would not follow his advice and report to work, he would no longer represent her. The referee concluded the evidence supported the client's version of the matter.

¶ 36. In his appeal of Case No. 2006AP1191–D, Attorney Nunnery challenges the sufficiency of the evidence to support the referee's fact findings with respect to all counts except counts 5, 7, and 8. While

---

[14] Former SCR 20:1.16(d) provided as follows:

Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

admitting violations charged in counts 5, 7, and 8, Attorney Nunnery asserts no harm resulted due to these violations, as well as the other violations.

¶ 37. Attorney Nunnery contends the OLR and the referee failed to appreciate the environment of handling a civil rights case and failed to analyze the complexities of discrimination claims.[15] Attorney Nunnery cites his years of experience in the area of civil rights litigation. He argues that all the client matters here involved complicated fact scenarios. He submits that Mr. and Mrs. D. had no prima facie case of discrimination.

¶ 38. Attorney Nunnery also argues the referee and the OLR have not performed a complete analysis of his communications with his clients. He says the record establishes Mr. and Mrs. D. were fully informed. He argues Mrs. D.'s credibility is lacking, citing examples of her inconsistent testimony. Attorney Nunnery also denies he misled the OLR staff.

¶ 39. Regarding his representation of L.G., Attorney Nunnery asserts that L.G. acknowledged discussions of various matters and had received information about the discrimination suits. With respect to client A.S., Attorney Nunnery contends he had achieved all that had been required within the scope of his representation, and that he acted reasonably in securing her reinstatement and back pay.

¶ 40. A referee's findings of fact are affirmed unless they are clearly erroneous. *In re Disciplinary*

---

[15] During oral argument, Attorney Nunnery cited a number of federal cases in which he has been involved, including, for example, *Blise v. Antaramian,* 409 F.3d 861 (7th Cir. 2005), and *Hardin v. S.C. Johnson,* 167 F.3d 340 (7th Cir. 1999).

*Proceedings Against Polich,* 2005 WI 36, ¶ 25, 279 Wis. 2d 266, 694 N.W.2d 367. The referee is best situated to judge the credibility of witnesses. *Id.* No deference is granted to the referee's conclusions of law, which we review de novo. *Id.,* ¶ 4. We determine de novo the appropriate level of discipline, giving no conclusive weight to the referee's recommendation. *In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶ 41. We are satisfied the record supports the referee's findings and conclusions with respect to all 21 counts. Attorney Nunnery was not alleged to have provided an inadequate analysis of the merits of his clients' respective discrimination suits. We appreciate the complexities of civil rights litigation. For the most part, the disciplinary charges involve violations of rules requiring reasonable communication with clients, as well as truthful communication with the court and the OLR. We conclude the complexities of litigation should not relieve an attorney of the duty to keep a client reasonably informed about the status of a matter, to provide a client with explanations reasonably necessary to permit informed decisions, and to provide truthful information to a court as well as during an OLR investigation.

¶ 42. To the extent a witness's testimony may have revealed inconsistencies and disputes regarding the nature and extent of communications with Attorney Nunnery, it is the referee's function to resolve them. *See In re Disciplinary Proceedings Against Arthur,* 2005 WI 40, ¶ 53, 279 Wis. 2d 583, 694 N.W.2d 910. Here, the referee specifically expressed her belief in the clients' versions of the events in question. She was entitled to

do so. *See In re Disciplinary Proceedings Against Pump,* 120 Wis. 2d 422, 426, 355 N.W.2d 248 (1984). The referee's findings supporting her conclusions of law have not been shown to be clearly erroneous.

¶ 43. Next, Attorney Nunnery argues that the referee's recommendation for a six-month license suspension is excessive. He contends a public reprimand would be sufficient discipline. *See In re Disciplinary Proceedings Against Theobald,* 2004 WI 59, 271 Wis. 2d 690, 679 N.W.2d 804; *see also In re Disciplinary Proceedings Against Kasprowicz,* 2004 WI 151, 277 Wis. 2d 96, 690 N.W.2d 13. He says no client suffered any harm. Also, although Attorney Nunnery does not specifically argue mitigating factors here, the record discloses the referee's consideration of Attorney Nunnery's significant personal and physical problems during the relevant time periods, including his hospitalization, as well as the illness and death of a member of his family. The referee noted Attorney Nunnery admitted that, as a sole practitioner, he had taken on more work than he could handle effectively.

¶ 44. As to the appropriate sanction, the court must first consider the seriousness of the misconduct. *See In re Disciplinary Proceedings Against Charlton,* 174 Wis. 2d 844, 875–76, 498 N.W.2d 380 (1993). The court must also consider the need to protect the public, the courts, and the legal system from the attorney's repetition of misconduct, to impress upon the attorney the seriousness of the misconduct, and to deter other attorneys from engaging in similar misconduct. In the case of *In re Disciplinary Proceedings Against Brandt,* 184 Wis. 2d 611, 516 N.W.2d 418 (1994), a 6–month suspension was imposed for 19 rules violations with respect to diligence, communication, competency, fail-

ing to protect a client's interest on termination of representation, and failing to cooperate with the OLR.

██

¶ 45. Here, the referee found 21 counts of misconduct, a number greater than found in the *Theobald* (13 counts) and *Kasprowicz* (16 counts) cases upon which Attorney Nunnery relies. Also, unlike Attorney Nunnery's history, the attorneys in *Theobald* and *Kasprowicz* had never been previously disciplined. In addition, we find unpersuasive Attorney Nunnery's contention that no harm was done. The referee found and the record discloses the frustration and stress suffered when clients did not receive reasonable information and explanations from their attorney. Also, misleading communications or misrepresentations to clients, the OLR or a court impair the functioning of the legal system as a whole. Given the number and nature of the violations, Attorney Nunnery's prior disciplinary history, together with the mitigating factors referenced by the referee, we conclude a six-month suspension and costs should be imposed.

## II.
### CASE NO. 2007AP1908-D

¶ 46. In Case No. 2007AP1908-D, the OLR filed a 15-count disciplinary complaint against Attorney Nunnery arising from four client matters. Following hearings conducted April 28, 2008, to May 1, 2008, Referee Ferguson concluded the record supported the 15 counts of professional misconduct as charged.

A. *The J.D. Estate Matter (Counts 1 through 7).*

¶ 47. A Dane County circuit court commissioner filed a grievance with the OLR in May 2006 regarding

444

Attorney Nunnery's handling of a probate matter involving the estate of J.D. The referee found Attorney Nunnery committed seven counts of professional misconduct with respect to J.D.'s estate:

*Count 1:* Former SCR 20:1.3; Diligence.

*Count 2:* Former SCRs 20:1.15(e)[16] and 20:1.15(f)b.;[17] Trust account and client records.

[16] Former SCR 20:1.15(e) (effective prior to July 1, 2004) provided:

> Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: (i) a cash receipts journal, listing the sources and date of each receipt, (ii) a disbursements journal, listing the date and payee of each disbursement, with all disbursements being paid by check, (iii) a subsidiary ledger containing a separate page for each person or company for whom funds have been received in trust, showing the date and amount of each receipt, the date and amount of each disbursement, and any unexpended balance, (iv) a monthly schedule of the subsidiary ledger, indicating the balance of each client's account at the end of each month, (v) a determination of the cash balance (checkbook balance) at the end of each month, taken from the cash receipts and cash disbursement journals and a reconciliation of the cash balance (checkbook balance) with the balance indicated in the bank statement, and (vi) monthly statements, including canceled checks, vouchers or share drafts, and duplicate deposit slips. A record of all property other than cash which is held in trust for clients or third persons, as required as paragraph (a) hereof, shall also be maintained. All trust account records shall be deemed to have public aspects as related to the lawyer's fitness to practice.

[17] Former SCR 20:1.15(f)b. (effective July 1, 2004, through June 30, 2007) stated:

> Individual client ledgers. A subsidiary ledger shall be maintained for each client or matter for which the lawyer receives trust funds, and the lawyer shall record each receipt and disbursement of that client's funds and the balance following each transaction. A lawyer shall not disburse funds from the trust account that would create a negative balance with respect to any individual client or matter.

*Count 3:* Former SCR 20:3.3(a)(1); Candor toward a tribunal.

*Count 4:* Former SCR 20:3.4(c);[18] Fairness.

*Count 5:* Former SCR 20:8.4(c); Dishonesty.

*Count 6:* SCR 22.03(6) and former SCR 20:8.4(f); Misrepresentation to the OLR.

*Count 7:* SCR 22.03(2)[19] and former SCR 20:8.4(f); Disclosure to the OLR.

¶ 48. In 1984 J.D. executed a will naming Attorney Nunnery as successor personal representative of his estate should his wife predecease him. In 1991 J.D. signed two durable powers of attorney naming Attorney Nunnery as his agent for financial management and healthcare.[20]

¶ 49. After J.D. was admitted to a nursing home in 1997, Attorney Nunnery assumed responsibility for

---

[18] Former SCR 20:3.4(c) stated a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists; . . . ."

[19] SCR 22.03(2) provides:

> Upon commencing an investigation, the director shall notify the respondent of the matter being investigated unless in the opinion of the director the investigation of the matter requires otherwise. The respondent shall fully and fairly disclose all facts and circumstances pertaining to the alleged misconduct within 20 days after being served by ordinary mail a request for a written response. The director may allow additional time to respond. Following receipt of the response, the director may conduct further investigation and may compel the respondent to answer questions, furnish documents, and present any information deemed relevant to the investigation.

[20] The 1991 durable power of attorney provided "my healthcare agent . . . shall not be entitled to compensation for services rendered hereunder." The power of attorney for financial man-

446

J.D.'s health care and financial decisions. J.D.'s wife died in 1997 and J.D. died in 1999. At the time of his death, J.D. owned a home, a set of silver flatware, an antique sofa and other miscellaneous personal property. J.D. also owned a checking account titled, "[J.D.] Willie Nunnery POA" ("POA Account"), which Attorney Nunnery used before J.D.'s death to manage J.D.'s finances due to his failing health.

¶ 50. Attorney Nunnery began developing a plan to sell J.D.'s house and use the proceeds for J.D.'s care. On May 23, 1999, Attorney Nunnery signed, as J.D.'s "POA," an acceptance of an offer to purchase J.D.'s house. The referee found that Attorney Nunnery misrepresented to the OLR that he had included "POA" on sales documents in error.

¶ 51. The referee found that between the date of J.D.'s death on April 30, 1999, and June 22, 1999, Attorney Nunnery did not obtain court authority to act on behalf of J.D.'s estate, including the authority to negotiate the sale of J.D.'s house, issue checks from the POA Account or sign any documents on J.D.'s or the estate's behalf. After Attorney Nunnery's powers expired upon J.D.'s death, Attorney Nunnery continued to represent himself as J.D.'s agent and signed documents as J.D.'s "POA."

¶ 52. On June 22, 1999, Attorney Nunnery filed a special administration petition in Dane County probate court, seeking to be appointed special administrator of J.D.'s estate to complete the closing on the sale of J.D.'s

---

agement, however, provided J.D.'s agent would be entitled to compensation not to exceed the amount a Wisconsin corporate fiduciary would charge under the same or similar circumstances. J.D. and Attorney Nunnery had no additional fee agreement allowing for compensation for any other pre-death legal services.

house. The referee found Attorney Nunnery misrepresented on that petition the date of J.D.'s death as May 30, 1999, instead of April 30, 1999, to conceal the fact that he continued to represent himself as J.D.'s POA by issuing checks from J.D.'s POA Account between April 30, 1999, and June 22, 1999. Attorney Nunnery did not disclose to the probate court that he had already signed documents accepting the buyers' offer after J.D.'s death.

¶ 53. On June 25, 1999, Attorney Nunnery deposited into his pooled client trust account the proceeds from the sale of J.D.'s house totaling $84,684.91. Attorney Nunnery disbursed a number of checks to beneficiaries and to himself from the proceeds of the house sale.

¶ 54. The referee found that from June 1999 through April 2006, Attorney Nunnery did not bill the estate and did not maintain checking account records or any records of the services he provided or compensation due for his services to the estate. Also, Attorney Nunnery did not make any claims against the estate for fees beyond his legal fees. Attorney Nunnery did not maintain trust account records, including a cash receipts journal, a disbursements journal, a subsidiary client ledger for each client matter, a checkbook register, or journal entries for the assets belonging to J.D.'s estate.

¶ 55. In August 2000 Attorney Nunnery filed an application for an informal administration, which misrepresented J.D.'s date of death as May 30, 1999. Attorney Nunnery did not petition the court to name himself or anyone else as personal representative. Between May 21, 2001, and December 20, 2005, the probate court issued a series of orders requiring Attorney Nunnery to explain why the estate had not yet been closed. In June and December 2005 Attorney Nunnery failed to appear at hearings to show why the estate had

448

not been closed. On December 20, 2005, the court ordered Attorney Nunnery removed as personal representative and attorney for the estate.

¶ 56. On March 2, 2006, the court ordered Attorney Nunnery to appear at the Dane County probate office and bring all records in his possession regarding the estate. Attorney Nunnery, along with another attorney whom Attorney Nunnery had retained, appeared in person before the commissioner. After receiving an extension to file estate documents, Attorney Nunnery provided an interim report of disbursements, showing a deposit of $84,684.91 into Attorney Nunnery's pooled client trust account.

¶ 57. The interim report identified nine disbursements between June 25, 1999, and December 28, 1999, totaling $55,925.81. The report did not, however, inform the court of certain disbursements totaling $18,000 by checks that contained notations they were for estate fees. The referee found Attorney Nunnery's business account would have been overdrawn if one of the checks for estate fees had not been deposited.

¶ 58. Also, Attorney Nunnery did not list the antique sofa or flatware set on the interim report, but informed the commissioner that these items were "in storage" at his office. The referee found, however, that the sofa was "stored" in a place where people could sit on it.[21] The referee found that Attorney Nunnery misrep-

---

[21] Referee Ferguson found Attorney Nunnery retained and still retains J.D.'s silver flatware and antique sofa, which Attorney Nunnery had reupholstered using $1,691.38 of the estate's funds. Attorney Nunnery stated to the OLR that he had reupholstered and used the sofa because he considered it compensation for his services acting as power of attorney for financial management.

resented to the probate court and to the OLR that he had "stored" J.D.'s sofa and flatware at his office.

¶ 59. The referee also determined that Attorney Nunnery misrepresented to the OLR he had not intended to pay himself substantially $28,749 of estate assets remaining in trust as of December 28, 1999. Attorney Nunnery did not disburse the estate's remaining assets after that day and, through his attorney, admitted that he had misused the funds. The referee found that Attorney Nunnery did not have the authority to make any of the disbursements that appeared on the interim report.

¶ 60. The referee found that in an April 10, 2006, report to the court commissioner, Attorney Nunnery stated he held the balance of the estate and assets and stood prepared to deliver those to the court as ordered. At the time he made this statement, however, he held none of the estate funds in his trust account. Attorney Nunnery had certified to the OLR that the information contained in the report was true and complete.

¶ 61. On April 21, 2006, Attorney Nunnery deposited estate funds with the circuit court via a cashier's check for $29,149.92. The money had not been disbursed from Attorney Nunnery's trust account, however, and Attorney Nunnery failed to respond to the OLR's request for the immediate source of the funds. The referee found Attorney Nunnery converted to his own use at least $30,450.48 from the estate's funds deposited in his trust account. The referee found that Attorney Nunnery failed to disclose his disbursements from the POA Account after J.D.'s death, failed to disclose the actual balance in the POA Account as of J.D.'s death, and failed to inform the court that he continued to write checks as J.D.'s agent after his power of attorney expired upon J.D.'s death.

¶ 62. The estate was eventually closed in 2007. Attorney Nunnery admitted he was completely wrong in how he handled the estate, notwithstanding other stressors in his life. Attorney Nunnery does not challenge the sufficiency of the evidence to support the referee's findings and conclusions with respect to counts 1 through 7 and makes no objection to restitution.

B. *The K.M. Matter (Counts 8 through 10).*

¶ 63. On July 31, 2003, K.M. retained Attorney Nunnery to represent her on appeal of claims she had filed with the Equal Rights Division (ERD) of the Department of Workforce Development alleging race discrimination and sexual harassment. The referee concluded that Attorney Nunnery's representation of K.M. gave rise to three counts of professional misconduct:

*Count 8:* Former SCR 20:1.2(a); Scope of Representation.

*Count 9:* Former SCR 20:1.4(a); Communication.

*Count 10:* Former SCR 20:1.4(b); Communication.

¶ 64. The referee found that in October 2003 K.M. attempted to contact Attorney Nunnery to find out when they would meet to prepare for an ERD hearing scheduled for November 5, 2003. He did not return her calls. On November 3, 2003, Attorney Nunnery filed a notice of withdrawal and dismissal of K.M.'s ERD cases. He did not copy K.M. on the notice of withdrawal and dismissal or discuss it with her and did not have her permission to dismiss her complaint. After

receiving a letter from ERD regarding dismissal of her cases, K.M. spoke with Attorney Nunnery, who advised that the ERD letter was an error and would need correction.

¶ 65. In a January 2004 meeting, Attorney Nunnery did not mention to K.M. he had dismissed the ERD cases. In February 2004 K.M. contacted Attorney Nunnery because she had received a "right to sue" letter. Attorney Nunnery responded that she need not worry about the letter and he would take care of it. He did not advise K.M. of her rights and obligations related to the right to sue letter nor did he advise that he believed her case lacked merit.

¶ 66. In May 2004 Attorney Nunnery informed K.M. that if she called him one more time or sent any other correspondence, he would drop her case and return her retainer. In September 2004 K.M. sent Attorney Nunnery a memo regarding communication gaps in her case. He did not respond.

¶ 67. In August 2005 Attorney Nunnery and K.M. met for a final time during which Attorney Nunnery told K.M. her case lacked merit. A few days later, K.M. received her files from Attorney Nunnery along with a $750 refund of her retainer. K.M. was unaware until September 2005 that Attorney Nunnery had dismissed her ERD claims, and also learned then that the time limits to file a lawsuit had expired. The referee concluded that these facts supported counts 8 through 10.

C. *The D.H. Matter (Counts 11 through 13).*

¶ 68. In July 2001 D.H. hired Attorney Nunnery to represent him in an employment discrimination claim against his employer, several supervisors and his

union. The referee determined Attorney Nunnery's representation of D.H. gave rise to three counts:

*Count 11:* Former SCR 20:1.4(a); Communication.

*Count 12:* Former SCR 20:1.4(b); Communication.

*Count 13:* Former SCR 20:1.16(d); Terminating representation.

¶ 69. Attorney Nunnery filed a complaint in federal court on behalf of D.H. and a co-worker, S.B., alleging race discrimination and retaliation contrary to 42 U.S.C. § 1981. The referee found that Attorney Nunnery did not review the complaint with D.H. or explain the claims he was pursuing on D.H.'s behalf. The referee also found that Attorney Nunnery did not inform his client of (1) a motion to dismiss filed by one of the supervisors; (2) Attorney Nunnery's failure to timely respond to the motion; (3) the court's decision denying the motion; and (4) that Attorney Nunnery missed the discovery deadline for taking depositions. The referee said although Attorney Nunnery was subsequently granted an extension, he took no action to notice depositions and did not inform D.H. that he did not intend to conduct further discovery.

¶ 70. In addition, the referee determined Attorney Nunnery did not inform D.H. of summary judgment motions filed by the union and non-union defendants. Although Attorney Nunnery filed a motion to strike the summary judgment motion filed by the non-union defendants, D.H. was not sent a copy. When a dismissal was granted on behalf of all defendants, other than sending D.H. a copy of the court's decision by mail, Attorney Nunnery did not discuss with D.H. the reasoning or ramifications of the dismissal.

¶ 71. Attorney Nunnery filed an appeal of the dismissal with the United States Court of Appeals for the Seventh Circuit. The referee found that when Attorney Nunnery and D.H. participated in a court-mandated settlement conference on appeal, Attorney Nunnery informed the mediator the union was not required to participate. Attorney Nunnery did not have D.H.'s permission to dismiss the union from settlement negotiations and did not discuss with D.H. whether to do so. When D.H. inquired why the union had not been involved, Attorney Nunnery replied that he could not sue the union.

¶ 72. The referee found that on June 25, 2003, five days before an appellate brief was due and without notice to D.H., Attorney Nunnery filed a motion to withdraw as D.H.'s counsel. Attorney Nunnery did not advise D.H. he was withdrawing. On the basis of these findings, the referee concluded Attorney Nunnery committed misconduct as charged in counts 11 through 13.

D. *The S.B. Matter (Counts 14 through 15).*

¶ 73. The final matter involves Attorney Nunnery's representation of S.B., who was D.H.'s co-worker. S.B. retained Attorney Nunnery in an employment discrimination/retaliation claim against his employer and his union. The referee concluded Attorney Nunnery's handling of S.B.'s suit supported two counts:

*Count 14:* Former SCR 20:1.4(a); Communication.

*Count 15:* Former SCR 20:1.4(b); Communication.

¶ 74. On July 30, 2001, Attorney Nunnery filed a complaint on behalf of S.B. alleging race discrimination and retaliation. Attorney Nunnery did not discuss with

S.B. the claims brought on his behalf. When non-union defendants filed a motion to dismiss for failure to state a claim, Attorney Nunnery did not advise S.B. of the motion. On October 30, 2001, the district court granted the dismissal of S.B.'s 42 U.S.C. § 1981 claim.

¶ 75. On December 13, 2002, Attorney Nunnery filed a notice of appeal with the United States Court of Appeals for the Seventh Circuit. Ultimately, the dismissal was affirmed. During a court-mandated settlement conference on appeal, Attorney Nunnery did not discuss with S.B. the reasons he had informed the mediator the union could be dismissed from participation. Attorney Nunnery did not obtain S.B.'s permission to dismiss the union from the suit. The referee found that Attorney Nunnery's failure to communicate significant case developments with S.B. and to explain why he had abandoned S.B.'s claim against the union and had released it from the settlement conference supported counts 14 and 15.

¶ 76. In Case No. 2007AP1908–D the OLR appeals the referee's recommendation of a two-year license suspension. The OLR argues precedent supports revocation. It relies on *In re Disciplinary Proceedings Against Leadholm,* 160 Wis. 2d 190, 200, 465 N.W.2d 650 (1991), in which Attorney Leadholm's license was revoked for misconduct including neglect, failure to keep clients informed, failure to return unearned retainers and client documents upon termination of representation; failure to promptly deliver funds; failure to deposit client funds in the trust account and account for those funds; conversion of client funds; and failure to respond to the OLR's requests for information. The OLR cites additional cases with similar misconduct resulting in revocation. See, for example, *In re Disciplinary Proceedings Against Krombach,* 2005 WI 170,

286 Wis. 2d 589, 707 N.W.2d 146; *In re Disciplinary Proceedings Against Sheehan,* 224 Wis. 2d 44, 588 N.W.2d 624 (1999); *In re Disciplinary Proceedings Against Hinnawi,* 202 Wis. 2d 113, 549 N.W.2d 245 (1996) (conversion of estate funds; failure to promptly perform duties; unreasonable fee; trust account violation; misrepresentation to OLR; failure to act diligently; and failure to respond to client's attempts to contact him, and failure to respond to OLR inquiries).

¶ 77. The OLR argues Attorney Nunnery's misconduct is aggravated by his refusal to acknowledge the wrongful nature of his conduct and the vulnerability of the victims. The OLR says Attorney Nunnery has not yet made the remaining $1,300.56 payment he acknowledges is necessary to make whole the beneficiaries of the J.D. estate and still retains the estate's antique sofa and the silver flatware. The OLR contends the seriousness of the misconduct warrants revocation.

¶ 78. Attorney Nunnery acknowledges his misconduct in the estate matter warrants discipline. He says he accepted responsibility, made attempts to reimburse the estate, and never intentionally sought to deceive any of the estate's beneficiaries.

¶ 79. Attorney Nunnery nonetheless cross-appeals and challenges the referee's findings in the remaining client matters. He claims the referee failed to analyze D.H.'s testimony for credibility. Attorney Nunnery asserts S.B.'s claim against the union was meritless because there was no proof of any racially motivated union conduct, which is why the claim was dismissed. He further argues there is no showing his handling of the discrimination suits caused any financial loss.

¶ 80. Attorney Nunnery claims the recommended two-year suspension is unnecessary to protect the pub-

lic or to impress upon him the severity of his misconduct. At oral argument, Attorney Nunnery indicated a shorter suspension would be appropriate. In his appellate brief, he points to the stressors in his life at the pertinent times, including his own medical problems, a family member's death, being caught in Hurricane Katrina, as well as being subjected to a $2.5 million malpractice verdict which was ultimately reversed on appeal. Also, he was involved in handling complex litigation, including prosecuting the death of a young black man by a police officer in 2002 and a prisoner death case in Louisiana.

¶ 81. Because they have not been shown to be clearly erroneous, we approve and adopt the referee's findings. It is evident the referee believed the clients' versions of the events in question. Contrary to Attorney Nunnery's contentions, the merits of D.H.'s and S.B.'s civil rights claims are not relevant to a determination of the professional misconduct charged here. Also, Attorney Nunnery does not challenge the referee's findings with respect to the J.D. estate matter. As a result, it is undisputed Attorney Nunnery converted estate funds and made a number of misrepresentations, constituting flagrant misconduct. *See Krombach,* 286 Wis. 2d 589, ¶ 62.

¶ 82. While we recognize the gravity of Attorney Nunnery's misconduct, we are not persuaded it calls for the revocation of his license to practice law. Each case must turn on its individual facts. *Id.* In *Hinnawi* and *Krombach,* for instance, significant restitution had not yet been made. Here, Attorney Nunnery has indicated his remorse, accepted responsibility for the serious violations in his handling of the J.D. estate, and made significant restitution. It is undisputed Attorney Nun-

nery was faced with significant stressors involving his health, his family, as well as his law practice. While not excusing his misconduct, these factors indicate that Attorney Nunnery was not completely indifferent to restitution, as in *Hinnawi,* or engaged in a fraudulent scheme as indicated in *Sheehan.*

¶ 83. Attorney Nunnery is now facing a six-month suspension in Case No. 2006AP1191–D. An additional two and one-half year suspension, resulting in a total suspension of three years, together with full costs and restitution, is sufficient under the circumstances to protect the public, achieve deterrence, and impress upon Attorney Nunnery the seriousness of his misconduct.

¶ 84. IT IS ORDERED that the license of Willie J. Nunnery to practice law in Wisconsin is suspended for a period of three years, effective August 24, 2009.

¶ 85. IT IS FURTHER ORDERED that Willie J. Nunnery shall comply with SCR 22.26 regarding the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 86. IT IS FURTHER ORDERED that Willie J. Nunnery pay restitution as determined in the referee's report in Case No. 2007AP1908–D.[22] If the restitution is not paid within 60 days of this order, Willie J. Nunnery's license to practice law in Wisconsin shall remain suspended until further order of the court.

¶ 87. IT IS FURTHER ORDERED that the restitution as determined in the referee's report in Case No. 2007AP1908–D is to be completed prior to paying costs to the Office of Lawyer Regulation.

---

[22] The referee recommended that Attorney Nunnery make restitution in the amount of $1,300.56, along with the antique sofa and silver flatware, to the beneficiaries of J.D.'s estate.

¶ 88. IT IS FURTHER ORDERED that within 90 days of the date of this order Willie J. Nunnery pay to the Office of Lawyer Regulation the costs of these proceedings.[23] If costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, Willie J. Nunnery's license to practice law in Wisconsin shall remain suspended until further order of the court.

[23] On June 5, 2009, the OLR filed its supplemental statement of costs. In Case No. 2006AP1191–D, the OLR seeks costs of $25,231.81. In Case No. 2007AP1908–D, the OLR seeks costs of $17,591.67. No objection to costs has been filed. *See* SCR 22.24(3).